Hoard *v.* Peck.

---

## HOARD *vs.* PECK.

The rule is general, that he who knowingly assists the wife in the violation of her duty as such, is guilty of a wrong, for which an action will lie, by the husband, where injury is thereby inflicted upon him. *Per* FOSTER, J.

An action can be maintained by a husband against a druggist to recover damages for selling to the plaintiff's wife, secretly, from day to day, large quantities of laudanum to be used by her as a beverage, and which are so used by her to the defendant's knowledge, without the knowledge or consent of the husband; the defendant well knowing that the same was injuring and impairing her health, and concealing the fact of such sales and use thereof from the plaintiff; in consequence of which use by her the wife became sick and emaciated, and her mind was affected, so that she was unable to perform her duties as such wife, and her affections became alienated from her husband, and he lost her society and was compelled to expend divers sums of money in medical and other attendance upon her. MORGAN, J., dissented.

On the trial of such an action, evidence that the defendant did not affix labels to the phials in which the laudanum was taken from his shop, is competent,

Hoard *v.* Peck.

if for no other purpose, as tending to prove the *clandestine* manner of selling which is claimed in the complaint.

In such an action a physician may be asked "what would the natural result of three of these bottles of opium, called laudanum, be upon the plaintiff's wife, as you know the woman, and her situation and constitution," &c. ?

The true rule is, not to base a question upon the evidence which has been already given, but to state a hypothetical case to the witness.

APPEAL from an order made at a special term, denying a motion for a new trial, upon the minutes of the judge.

The action was tried at the Jefferson county circuit court, before his honor Justice MULLIN. The jury found a verdict for the plaintiff for $500. The defendant moved for a new trial upon the minutes, at a special term held before the same justice; who denied the motion; and from his order the defendant appealed, and the case and exceptions were ordered to be heard, in the first instance, at the general term.

*F. W. Hubbard,* for the appellant.

*S. H. Hammond,* for the respondent.

FOSTER, J. The facts claimed in the complaint, and proved on the trial, were as follows: The plaintiff and his wife were residents of the village of Watertown, in the county of Jefferson. They had two children. The wife of the plaintiff, previous to January, 1866, enjoyed good health, and had the charge of the plaintiff's household affairs, and of the children. The defendant had been for some years a druggist, in that village, and knew the plaintiff and his wife. From January, 1866, to October of that year, the defendant from day to day secretly sold to the wife, to be used by her as a beverage, and which she did use as a beverage, large quantities of laudanum, ranging from four to twelve ounces per day, which the defendant knew was used by her as a beverage, without the knowl-

edge or consent of the plaintiff; and well knowing, while he was so selling the laudanum to her, that it was injuring and impairing her health; and concealing the fact of such sales, and use thereof, from the plaintiff; and from the use of the drug the wife of the plaintiff became sick and emaciated, and her mind was affected, so that she was unable to perform her duties as such wife, and her affections became alienated from the plaintiff, and he lost her affections and society, and was compelled to expend divers sums of money in the medical and other attendance upon her in effecting a cure.

It is not necessary to examine the evidence in detail. All the above facts were proved by the witnesses for the plaintiff, and were not to any material extent contradicted by the testimony of the defendant; and, under the charge of the judge, the jury found them all to be true; and so far as there was any conflict in the evidence, we are to assume that the jury gave credit to the testimony which supported the finding.

The main question is, can the plaintiff, upon such a state of facts, maintain an action.

It is claimed for the defendant, that the selling of laudanum is a lawful business, and that therefore no action will lie against him; that it is like the selling of intoxicating liquors, the selling of which he claims is lawful, except so far as restrained by positive statutory enactment. And it is also claimed that, whether lawful to sell it or not, the wife having voluntarily used it, the defendant not having assisted her in the act of taking it, therefore he is not liable for the injury caused by her use of it.

Although there is no statute prohibiting the sale of laudanum, either as a beverage or for any other purpose, it does not follow that therefore a sale of it in all cases is lawful. Its lawfulness, or unlawfulness, depends upon the circumstances of the sale, and the uses and purposes to which it is to be applied. It is doubtless lawful to sell

Hoard *v.* Peck.

laudanum as a medicine, or for any chemical or mechanical purposes, if any, for which it may be used.   It is also, as a general rule, lawful to sell spirituous liquors as a beverage, except in the cases prohibited by statute, and I know of no reason why the sales of spirits prohibited by statute would not be lawful, in the absence of such prohibition.

But it does not follow from this that an action may not be maintained against one who improperly sells ardent spirits to a wife or servant, although no notice not to do so had been given, pursuant to the statute.   (2 *R. S.*, 5*th ed.* 944, 945, §§ 21, 29.)   Where notice not to sell has been given, a single sale, in a case so prohibited, would subject the offender to the penalty, and for any damages sustained thereby; while without the notice such sale would be lawful, because from time immemorial it has been lawful to use ardent spirits as a beverage, and sales for that purpose have been allowed.

But, independent of the statute, if a party should allow a wife or servant of another to frequent his drinking room, without the knowledge of the husband or master, and should daily furnish the wife or servant with liquors to be *there drank*, until intoxicated, and the husband or master thereby sustains a pecuniary loss, does it follow because it is lawful to sell it as a beverage, under other circumstances, that it is lawful for a party, daily, to help the wife or servant to become intoxicated, to the loss and damage of the husband or master?   When such a case arises it will be necessary to consider it more fully, and to determine it; but if it should be found to be lawful, it would not aid much in the determination of this case, in favor of the defendant.

The sale of laudanum as a beverage is very uncommon. It is well known to be poisonous.   It cannot be used as a beverage without impairing the physical and mental energies; and this is generally well known, and it certainly is

to all druggists. Suppose a druggist should clandestinely, three times a day, sell to a wife, to be *then* and *there* drank *in his presence,* and having every reason to believe that it was against the consent and will of the husband, four ounces of laudanum, amounting in the whole to twelve ounces per day, and should continue to do so for the term of nine months, seeing and knowing during all that time that it was destroying her intellect, impairing her health, and inflicting injury upon the husband; is it possible that the law would afford no redress to the party aggrieved, or would it be any justification that the wife desired it? or, that it was her hand that held the potion to her lips? The druggist, by the act of handing it to her for that purpose, is as much responsible for the consequences as though he assisted her directly in pouring it down her throat. If this were an action for negligence of the defendant, negligence of the wife would prevent the plaintiff from recovering, on the ground that her negligence contributed to the injury; but it is a case where the druggist and wife united in the doing of acts injurious to the interests of the husband. In my judgment it might as well be said, if a stranger and a servant conspired together to injure the property of the master, the stranger furnishing the means and the servant alone using them in inflicting the injury, that the master cannot recover of the stranger, because his act is not the immediate one in producing it. The action in such case would lie against the stranger, because he acted in concert with the servant, and because his act aided in the consummation of the injurious act.

In this case, the wife and defendant united and acted in concert, in doing the wrong complained of, and if the defendant had performed his duty to the plaintiff, by informing him what they were doing, the result which was reached would have been prevented.

If one arms another with a weapon to be used by him upon the person of a third, and it is so used, the one fur-

Hoard *v.* Peck.

nishing it is a participator in the whole transaction, and liable for the result, although not present when it was accomplished, and notwithstanding the person to whom the weapon was furnished might, for aught he knew, finally resolve not to use it. If one furnishes the means, with the knowledge that it is to be unlawfully used, assenting to such use, he is answerable for the consequences, if the design is carried out.

It is said by the counsel for the defendant, that in general, to maintain a claim for special damages, they must appear to be the legal and natural consequences of the wrong complaind of, and proceeding exclusively from that, and not from the improper act of a third person, remotely induced thereby. (*Crain* v. *Petrie*, 6 *Hill*, 522.) The rule as laid down was properly applicable to that case, but I cannot see how it aids this defendant. In this case the wife of the plaintiff occupied no such relation to the defendant as was there meant by the term *third person.* Nor was she remotely induced by the act of the defendant to take the injurious drug. They were associated together and acting in concert in the commission of the wrong, she being induced by the desire for the exhil@ration produced by the use of it, and he by the desire of gain, and his was no *remote* act. The law regards each sale (under the circumstances proved) as one and the same transaction; as much as though each *sale* and *use* had been at the same instant of time.

There are no decisions upon any case identically the same as the one under consideration. It does not however prove, because the case is new, that the action cannot be maintained. The action is adapted to every special invasion of one's rights. (1 *Comyn's Dig. title Action, A, note* 1. 4 *Burr.* 2345.) And it is no objection to an action, that it is new, in the instance, if it be not new in its principle. (1 *Comyn's Dig. supra, and note* 1. 3 *Term. Rep.* 63. 2 *Maule & Sel.* 405.) In Burrow's Reports, (*supra,*)

it is said : "It is clear to me, that though the above was such a species of property as was then not properly known to, or at least not established by, precedent at common law, yet the novelty of the question did not bar it of the common law remedy and protection. * * * That the person invading it had nothing to do with it, and that he erred against the rules of morality and justice, in disturbing another's possession or pleasure." * * * The common law being founded on such principles as have been laid down * * "the remedy by action upon the case is suited to every wrong and grievance that the subject may suffer from a special invasion of his right; for this sort of action varies, says Lord Coke, according to the variety of the case."

An action is maintainable by the owner of a dog, against one who puts poisoned food where he knows the animal will pass along and get it, (*Dodson* v. *Mack*, 4 *Dev. & Batt. N. C. Rep.* 146,) and yet the act of the defendant did not necessarily cause the death of the dog, nor could the defendant have known that it would, for he could not know with certainty, nor was it certain, that the dog would pass the place, or if he did that he would discover or would eat the poisoned food. Yet the act of the defendant in that case was not deemed to be too *remote.*

There was in that case no collusion, and no certainty that the injury would be produced; in this there was both. The defendant knew the drug would be taken by the plaintiff's wife. He colluded with her for that purpose, and he knew that the effect would be injurious to the interests of the plaintiff.

It is enough to entitle a party to an action, that the damage be closely connected with the injurious act complained of. (*Comyn's Dig., Action, B.* 4, *note l.*)

There are a variety of acts of third persons for which a husband can maintain an action, though his wife unites in the immediate act causing the injury; as where a man entices a wife away from her husband, or harbors her, she

Hoard *v.* Peck.

having left him without cause. (*Reeve's Dom. Rel.* 139.) In an action for criminal conversation with the wife, the action is founded upon the alienation of the affections of the wife from the husband, rendering her unfit for his society, and exposing him to shame, ridicule, and the hazard of maintaining spurious issue. (*Reeve's Dom. Rel.* 139.) And in such case he can maintain the action, whether the defendant by artful means seduces the wife, or she consents readily to his base proposals, or if she herself first proposes the criminal intercourse. It is enough if the defendant is an actor in producing the injury to the plaintiff; and which of them is the seducer, is material only upon the question of damages.

I think the rule is general, "that he who knowingly assists the wife in the violation of her duty, as such, is guilty of a wrong for which an action will lie, where injury is thereby inflicted upon the husband." (*Barnes* v. *Allen,* 30 *Barb.* 668, *per Lott, J.*)

In the language of the counsel for the plaintiff, "his wife did not *apply* for the laudanum of the defendant, as a medicine, and he knew it; it was not *intended* to be used as a medicine, and he knew it; she was violating her duty to her husband in purchasing and using the drug; violating her duty to her family, and destroying her health, and the defendant knew it. He aided her, and furnished her with the means of doing all this. The very sale to her of the poison, and the using of it as she did, destroyed her volition; and so perverted her judgment that she had no moral power to resist the temptation to continue its use. This habit, so resistless in its tyranny, was the sequence of the sale of the drug to her, by the defendant, and he knew it. He was, in fact, for a portion of the time, selling it to a morally insane person, whose insanity was caused by his own wrong. And I may add that the proof shows, by his own declarations, that he sold it to be used by her, when

he believed she was not in her right mind.   He continued to sell it to her, and kept it secret from the plaintiff.   He acted in bad faith towards him, and his acts having contributed largely to the injury complained of, he is liable.

On the trial, the plaintiff proved that the defendant did not affix labels to the phials in which the laudanum was taken from his store, although the defendant objected to the evidence, on the ground that it was incompetent, and in due time excepted.   I think the ruling was right.   If for no other purpose, it was competent as tending to prove the *clandestine* manner of selling, which was claimed in the complaint.

The question put by the plaintiff's counsel to Doctor Grafton, " In your judgment, speaking from your experience as a physician and surgeon, what would the natural result of three of these bottles of opium, called laudanum, be upon Mrs. Hoard, as you know the woman, and her situation and constitution, and all that ?"   The defendant's counsel objected to the question as incompetent, because the question assumed that she took the whole of it as a beverage or medicine; that the plaintiff should be required to show it was taken, and also all the uses that laudanum may be put to.   The court overruled the objection, and admitted the answer, and the defendant's counsel excepted.   The witness answered the question.   Nothing can be clearer, upon authority, as well as upon principle, than that the question was proper.   If it had been based upon the evidence which had then been given, there is good ground for holding that it should have been excluded ; because the witness would have been called upon to determine as to the truth or falsity of all of the evidence ; and he would have, also, to found his conclusions as to the effect to be given to it, both of which belonged exclusively to the jury ; while in the form in which the question was put, if the jury found that the facts proved did not warrant any or all of the assumptions of the hypothetical

Hoard *v.* Peck.

question, they would treat the answer of the doctor as not relevant to the case. The true rule is to state a hypothetical case to the witness. (*Lake* v. *The People*, 1 *Park. Crim. Rep.* 495; *same case,* 2 *Kern.* 358, *and The People* v. *Thurston,* 2 *Park. Crim. Rep.* 49.)

There was no error in the refusal of the court to charge that "if the defendant sold the laudanum as other druggists did, in the ordinary course of his business, as a beverage, he is not liable for the improper use of it by the purchaser;" or that "if the jury believe the plaintiff's wife obtained laudanum from other sources than of the defendant, and took the same into her system, the defendant is not responsible;" or that "the defendant cannot be made liable because of mere knowledge of the use of the drug, by the plaintiff's wife, as a beverage."

I shall not discuss these questions further than to say that the judge had already charged the jury fully, and had submitted to them the same propositions above stated, with the proper qualifications. And the jury could not possibly be misled by anything contained in the charge; and as a whole, including the refusal to charge, I have no doubt that it was correct.

To that portion of the charge authorizing the jury to give punitive damages, in case they found the defendant had acted in bad faith in the sale of the laudanum, *there was no exception,* and the question is now raised for the first time.

I think the charge was correct. But the question is not merely whether it was correct or not; but in order to affect our decision, (there being no exception,) it must appear, not only that it was wrong, but that it influenced the verdict; and it is sufficient to say that, as compensatory, merely, the damages were not excessive, but were well warranted by the injury proved. The defendant was not injuriously affected by the charge, and we cannot set it aside, even if erroneous.

The order of the special term denying a new trial should be affirmed, and judgment entered for the plaintiff.

BACON and MULLIN, JJ., concurred.

MORGAN, J., (dissenting.) The recovery in this case is for damages which the plaintiff alleged he sustained in consequence of the defendant's selling opium to his wife, the defendant being a druggist, and knowing, or having good reason to know, that the plaintiff's wife was using the same in such quantities as to injure her health; and the jury having been instructed that the defendant was liable to the plaintiff for the damages which the husband had sustained in consequence of her loss of health, the recovery included damages for the plaintiff's loss of the services of his wife, as well as the loss of her comfort and society while in ill health, caused by the improper use of opium. The defendant made the point, on the trial, that the action could not be maintained, and asked for a nonsuit, which was denied.

In my opinion the action is not sustainable upon any ground known to the common law, and that the motion for a nonsuit should have been granted.

I have been unable to find a precedent for such an action; and although this is not a sufficient reason to refuse a remedy, still the action must be brought within some acknowledged principle of law, or it will fail. There are many cases where such an action would be maintainable, if the principle upon which the action is based can be defended. Persons who sell intoxicating liquors would be liable, in an action, to the husband, for selling them to his wife, as a beverage, and also for selling them to his children, and yet no such action has been brought at common law, although the evil is one of great magnitude, and often resulting in very great damages to the husband and parent. This must have been the sense of the legislature;

Hoard *v.* Peck.

and to remedy the defect of the common law in not providing a remedy in such cases, the sale of intoxicating drinks to persons guilty of habitual druukenness was declared unlawful by the act of 1857; and hotel keepers were made liable for all the damages which might be sustained in consequence of such sale. (*Laws of* 1857, *ch.* 628, §§ 21, 29.)

Druggists are not under any contract or legal liability to husbands for selling medicines to their wives, or to parents, for selling medicines to their children. Physicians who prescribe for them are under a legal obligation to use proper skill, and if they fail, are liable for *mal practice.* But druggists and chemists are confined to the due exercise of their business, to the preparing, compounding, dispensing and vending drugs and medicines and medicinal compounds. (*Chitty on Cont.* 481.) No case can be found where they have been made liable because the persons to whom the medicines were sold made an improper use of them. It was not illegal for the plaintiff's wife to use the opium sold to her, in excess, so as to injure her health; but if it had been, the defendant would not have been liable, unless he had been guilty of something worse than the *mere act of sale,* by means of which she was enabled to perpetrate the wrong. This is deducible from several cases where the question has arisen as to the liability of a merchant who sells goods, knowing or having reason to know, that they are to be used for smuggling purposes or to evade the revenue laws. If nothing can be proved against him except the bare act of sale, he is not responsible for the subsequent unlawful acts of third persons who purchase with intent to commit a public or private wrong, however strong may be his suspicion that the purchasers intend to use the goods for illegal purposes.

There are many cases of moral obligation which may be violated, without responsibility to third persons who are indirectly injured in consequence of it. The moral duties

which one man owes another are not the foundation of an action. It is only when the law creates a legal duty, that a violation of it can be made the basis of an action.

Now what duty did the defendant in this case owe to the plaintiff? If we grant that he was unkind and unneighborly in not advising the husband of his suspicions that the wife was injuring her health and endangering her life by the improper use of opium, we must concede that he was under no legal obligation to communicate the information. Unless the defendant was legally bound to communicate his suspicion to the husband, his refusal to sell her any more opium would have been of no practical benefit to the husband; for without doubt she could have as easily supplied herself at some other store. The sale of opium was not illegal, and no one could have been made responsible for the mere act of sale.

But the action in this case entirely relieves the plaintiff's wife of responsibility to her husband for her improper use of the article—I speak of moral responsibility—for it is to be observed that the wife was under no legal restraint, nor could she be put under any legal restraint, not to use opium. If there was any way known to the law to enforce the social and moral obligations which the husband owes to the wife, or the wife to her husband, in respect to the use of hurtful stimulants, there would be more occasions for wives to restrain their husbands than for husbands to invoke the aid of the law to restrain their wives.

A wife has no legal control over her husband, nor has he any legal control over his wife if she chooses to indulge in the improper use of opium. He may sometimes withhold from her the means of procuring such articles, but in a majority of cases she has means of her own, or can find some way to procure such articles, without calling upon her husband. It will not, I think, be maintained that the husband can punish his wife and prevent the evil in that way.

Whatever may be the common law on the subject, the moral sense of this community, in our present state of civilization, will not permit the husband to inflict personal chastisement on his wife, even for the greatest outrage. (*Perry* v. *Perry,* 2 *Paige,* 503, *Walworth, Chancellor.*) Nor can he, it seems, obtain legal control of her person so as to prevent her going out at her pleasure. It was held in a recent case in England, that she may voluntarily absent herself from her husband, and that a court of common law has no jurisdiction to issue a writ of *habeas corpus* to bring up her body, unless she is restrained of her liberty. In *ex parte Sandilands,* (12 *Eng. L. and Eq.* 463,) Lord Campbell said that "if she were brought up we could only inquire of her where she would go; we could not compel her to return to her husband." Sir F. Kelley (solicitor-general) declared: "It may be questioned whether she can legally have any will independent of that of her husband." And this remark, at least, has some foundation in the decisions in some of the old reports. But Lord Campbell declared, in his opinion, "that the relation between husband and wife was different from that of parent and child. The parent has a right to the custody of the child. * * * But *a husband has no such right,* at common law, to the custody of his wife." Bishop, in his treatise on *Marriage and Divorce,* (§ 756,) says "that the English right of the husband to restrain in special circumstances the wife of her liberty, does not prevail with us, generally." He further observes, " there is in this country, where the ancient chivalry never literally prevailed, an increasing tendency in the law to look upon a woman as a being possessed of a human soul like man, and accountable, like him, to a higher power. And if the wife, with us, should desert her husband or behave herself improperly, there is over her the same law as over the husband in like circumstances."

Although the plaintiff's wife was responsible to no

human tribunal for her conduct, she was doubtless morally responsible to her husband and her God, for indulging a habit which in a measure rendered her unfit to discharge her obligations to either. If the defendant had been her physician or adviser, or if there had been a legal obligation on his part to withhold from her the means by which she was enabled to gratify her appetite, there are grounds upon which this action could be sustained. It is for the legislature, and not the courts, to invent a remedy for such a wrong, if the public good requires it. But while the woman is regarded as a responsible being, capable of determining for herself what is for her own good, third persons who supply her with implements of destruction in the lawful pursuit of their business, cannot be made civilly liable for her wrongful act in using them in an attempt to perpetrate suicide.

The case would be different if the defendant had any knowledge that the plaintiff's wife intended to commit a crime; for then he would be under a legal as well as a moral obligation to discover and prevent it. But here was was no illegal act meditated, and none in fact committed; for I take it, there is no common or statute law which could have been invoked to restrain the plaintiff's wife from taking opium. Nor can it be presumed that she intended to commit suicide, or that the defendant had any suspicion that she intended anything of the kind. No such case was proved on the trial, or submitted to the jury. The most that can be claimed is, that she was indulging in a habit which was injuring her health, and depriving her husband of the benefit of her services and the advantages of her society. The defendant was guilty of violating no law in selling her the opium by means of which she was enabled to indulge her habit. He was under no *legal* obligation to withhold the sale, or to notify the husband. Whatever moral wrong he committed, (and it was doubtless inexcusable,) it will not

Hoard *v.* Peck.

ιay the foundation of an action by the husband to recover damages.

The *wrong* in this case, if it could be regarded as a legal wrong, was committed by the wife of the plaintiff, and not by the defendant; and in such a case no action lies against him who indirectly gives occasion for its commission. Thus in *Vicar* v. *Wilcox*, (8 *East*, 1,) the defendant asserted that his cordage had been cut by the plaintiff, in consequence of which the latter, who was hired for a time certain, was discharged by his master; *Held* that no action lay, the damage being the wrongful act of the master, and not the legal and natural consequence of the words spoken. And in *Ashley* v. *Harrison*, (1 *Esp.* 48,) a performer employed by the plaintiff was libelled by the defendant, and in consequence refused to appear on the stage. It was alleged as special damage that the oratorios had been very thinly attended on that account. *Held* that the injury was too remote; and per Lord Kenyon: "If this action is to be maintained, it may equally be supported against every man who circulates the glass too freely and intoxicates an actor, by which he is rendered incapable of performing his part on the stage." (2 *Pars. on Cont.* 457, *note p.*)

Under any view of the case, I am unable to discover any ground upon which the verdict can be sustained.

The judgment should be reversed and a new trial granted, costs to abide the event.

Order of the special term affirmed and judgment entered for the plaintiff.

[ONONDAGA GENERAL TERM, October 1, 1867. *Bacon, Foster, Mullin* and *Morgan*, Justices.]