Simon Guiterman et al., Respondents, *v.* The Liverpool, New York and Philadelphia Steamship Co., Appellant.

It is not the province of a witness, testifying as an expert, to draw inferences from the evidence of other witnesses, unless the facts testified to are clear and uncontroverted, or to take into consideration such facts as he can recollect that have been testified to and thus form an opinion, but he should have full information of the ascertained or supposed state of facts upon which his opinion is based.

Where the facts are controverted or are not entirely clear a hypothetical question may be put, based upon the facts claimed to have been proved.

In an action against a common carrier by sea to recover damages for injuries to the freight by a collision with a collier, after a protest or statement as to the circumstances attending the injury and the management of the vessel had been given in evidence, and after witnesses had testified in reference thereto, there being a discrepancy between the protest and some of the testimony and the evidence covering a great variety of facts, a witness called as an expert by plaintiff, after having testified that he had heard the testimony read to the jury the previous day, and the protest and had heard the testimony of one or two of the witnesses and the circumstances as detailed by them, was asked "under the circumstances detailed by these witnesses and in the protest," and under certain circumstances which were specified, "what in your opinion should have been done by the persons in charge of the steamship?" *Held,* incompetent.

Under the English statutes in relation to compulsory pilotage in the port of Liverpool an owner of a vessel is not relieved from liability for damage to freight unless a pilot was in charge under the act, and was actually and necessarily engaged in the discharge of his duty.

Where, therefore, a vessel had left its dock at Liverpool in charge of a pilot and anchored in the river Mersey to finish loading and to receive coal for a voyage to New York, and while at anchor an accident occurred causing the loss, *held*, that the owner was not excused from liability by said statutes.

The goods damaged were sold at public auction. *Held*, that evidence of the prices brought was competent as tending to show value, and upon the question of damages.

(Argued December 8, 1880 ; decided January 18, 1881.)

APPEAL from judgment of the General Term of the Court of Common Pleas in and for the city and county of New York, entered upon an order made November 3, 1879, affirming a judgment in favor of plaintiffs, entered upon a verdict.

This action was brought to recover damages alleged to have been caused by defendant's negligence to certain goods of the plaintiffs which were shipped on board defendant's steamship, the City of Baltimore, at Liverpool for New York.

On December 25, 1865, the vessel left its dock, at Liverpool, in charge of a pilot, according to the usual custom, the water not being sufficient to allow the loading to be finished at the dock, to finish loading and coaling in the river Mersey.

After the arrival of the steamship at the city of New York, her master, officers and crew joined in making the following protest or statement :

" That on December 25, at 4:30 P. M., came to anchor with seventy-five fathoms chain off the landing stage, according to the usual custom of the port in like cases ; weather cloudy, wind strong ; at 5 P. M. a steam collier, with about seven hundred tons of coal on board, came alongside ; at 7 P. M. commenced coaling, collier secured alongside ; at 8 P. M., wind blowing very heavy in squalls and tide running very strong, which raised a nasty cross sea, found the vessel dragging ; veered out to ninety-five fathoms, but she did not come

up till off Egremont, a mile or more distant — the collier alongside, all the time working against and chafing our sides; midnight, strong winds and cloudy.

"December 26th, the wind continued strong throughout the night, collier still alongside; 6 A. M., wind shifted to the northward; the custom, while in the river, is to try the pumps at 8 P. M. and 8 A. M.; this morning, at 8 A. M., the carpenter, as usual, reported the vessel tight; at 10 A. M. the second officer, observing the vessel a little more by the head than usual, ordered the carpenter to sound the pumps; suddenly discovered six feet water in the fore compartment; he immediately reported to the chief officer and pilot; the chief officer immediately sounded the pumps again, and found an increase of water; instantly looked at the sluices which connect compartment with compartment; they were all shut down, and in the same moment he ordered all the pumps to be worked; in ten minutes after sounding again both the fore and main compartments, found the water gaining rapidly; second engineer soon after reported that the water was reaching the stoke-hole plates; the master was on shore attending to the business of the ship, and a messenger was sent for him; all hands at the pumps who could be spared except those searching for the leak; in about twenty minutes the ship had settled about eighteen inches by the bow; consulted the pilot, and we deemed the only course left was to beach the ship, for the leak could not be found; for this purpose, ordered the collier to cast off, which she did; soon after one of the searchers discovered the leak in the main orlop deck, immediately in the wake of where the collier was moored; the chief officer rushed below and saw a large volume of water streaming through a dead-light; after much exertion, and with the assistance of those he called to his aid, succeeded in closing the inner port, which is made of glass, and the leak stopped; then we gave up the idea of beaching the ship.    *    *    *    When we had time to look around, discovered the iron bolt that secured the outside and dead-light was broken and fell inside; the dead-light was gone, supposed to have fallen into the river; inboard, nothing

by any possibility could have broken the bolt, for it was well guarded from any thing reaching or injuring it; we believe the cause of the damage to have been occasioned by the collier in the cross sea while we were dragging or afterward striking against the dead-light violently, and the leak."

The goods in question were damaged by the water which flowed through the broken dead-light.

Upon the trial this protest was read in evidence on the part of plaintiffs. Witnesses were also called who testified to the circumstances of the accident and injury, their statements of the facts differing in a number of particulars from those contained in the statements. The further facts material to the questions discussed are set forth in the opinion.

*A. J. Vanderpoel* for appellant. Under the complaint it was part of the plaintiffs' duty to give the proof of negligence; it cannot be presumed from the fact that an accident happened. (1 Saunders on Pl. and Ev. 692; *Brothergan* v. *Wood*, 3 Brod. & Bing. 58; *Max* v. *Roberts*, 12 East, 89; *Moriarty* v. *Harnden's Express Co.;* 1 Daly, 227; *Hersfield* v. *Adams*, 19 Barb. 577; *Clark* v. *Barnwell*, 12 How. [U. S.] 272; *Davison* v. *Burnam*, L. R., 4 C. P. 117; *Bostwick* v. *Balt. & Ohio R. R. Co.*, 55 Barb. 137; *Muddle* v. *Stride*, 9 C. P. 380; *Howard* v. *Lindsay*, L. R., 5 P. C. 338; *Lauree* v. *Douglass*, 15 M. & W. 646; *Lamb* v. *Camden & Amboy R. R. Co.*, 46 N. Y. 271; *The Ducro*, 3 Ad. & E. 393.) The court erred in allowing the questions put to the experts. (*Tracy Peerage Case*, 10 Clark & Finn. 191; *Seymour* v. *Reynolds*, 77 N. Y. 178; *McCollum* v. *Seward*, 62 id. 316; *Reynolds* v. *Robinson*, id. 589, 595; *People* v. *Lake*, 12 id. 358; *Carpenter* v. *Beale*, 2 Lans. 206; *The Clement*, 2 Curtis' C. C. 363; *Sills* v. *Brown*, 9 Car. & P. 601; *Ann & Mary*, 2 W. Rob. 195; *U. S.* v. *McGlue*, 1 Curtis, 1; *Rex* v. *Searle*, 1 M. & Rob. 75; *Rex* v. *Wright*, 6 R. & R. C. C. 456; *Commonwealth* v. *Rogers*, 7 Metc. 500; *Freeman* v. *Lawrence*, 43 N. Y. Supr. 288; *Doltz* v. *Morris*, 10 Hun, 201; *Crofut* v. *Brooklyn Ferry Co.*,

36 Barb. 201; *Taylor* v. *Monnot,* 4 Duer, 116; *Hoard* v. *Peck,* 56 Barb. 202; *People* v. *Thurston,* 2 Park. Cr. 49; *Moore* v. *Westervelt,* 27 N. Y. 234; *Price* v. *Hartshorn,* 44 id. 94; *Walsh* v. *Wash. Marine Ins. Co.,* 32 id. 427; *Cincinnati Ins. Co.* v. *May,* 20 Ohio, 211, 223; *Carpenter* v. *Eastern Transp. Co.,* 71 N. Y. 574–579; *O'Hagan* v. *Dillon,* N. Y. Ct. App., 19 Alb. L. J. 177.)   This is not a case in which the opinion of experts not present and witnesses to the occurrence was competent. (*Jeff. Ins. Co.* v. *Cotheal,* 7 Wend. 72; *Moore* v. *Westervelt,* 27 N. Y. 234; *Walsh* v. *Wash. Marine Ins. Co.,* 32 id. 427; *Schermerhorn* v. *Tyler,* 11 Hun, 549; *Frazer* v. *Tupper,* 29 Vt. 409, 411; *Holland* v. *Cammet,* 5 La. Ann. 705; *Nowell* v. *Wright,* 3 Allen, 166; *Milwaukee & St. Paul R. R. Co.,* 94 U. S. 469; *Swartwout* v. *N. Y. C. & H. R. R. R. Co.,* 7 Hun, 571; *Hopkins* v. *Ind. & St. L. R. R.,* 78 Ill. 32; *Chicago* v. *McGiven,* id. 347; *Murphy* v. *N. Y. C. R. R. Co.,* 66 Barb. 125.)   The court erred in excluding the evidence that the owners of the ship were compelled to have on board a pilot who had entire charge of the ship, that the officers and crew were compelled to obey his orders relative to the management of the ship, and that by the law of England in cases in which pilotage is compulsory, the owners are exempt from liability for accidents occasioned by the negligent management of the ship during that period. (*Shular* v. *Hud. R. R. R. Co.,* 38 Barb. 653; *Brown* v. *Elliott,* 4 Daly, 329; *Greenfield* v. *Mass. Mut. L. Ins. Co.,* 47 N. Y. 430; *Evans* v. *Williams,* 60 Barb. 346; *Andrews* v. *Bond,* 16 id. 633; *Schermerhorn* v. *Van Allen,* 18 id. 29; *Dunford* v. *Chattels,* 12 M. & W. 529; Roscoe's Digest, 662; *Faverner* v. *Little,* 6 Bing. N. C. 688; *Hart* v. *Crowley,* 12 Ad. & Ell. 378; *Wolf* v. *Beard,* 8 Car. & P. 373; *Lucy* v. *Ingram,* 6 M. & W. 302; *Gen. Steam Nav. Co.* v. *British and Colonial Steam Nav. Co.,* L. R., 4 Ex. 238; *Mitchell* v. *Crassweller,* 13 C. B. 237; *Gen. Steam Nav.* v. *Guillon,* 11 M. & W. 877.)

*M. W. Devine* for respondents.   A clear case of negligence,

directly contributing to and causing the loss, being made out against defendant and its servants, it should be held liable for the consequences. (Angell on Carriers [4th ed.], §§ 166, 167, 168 ; Story on Bailments, §§ 512 [*a*], 517, 518, 3 Kent [10th ed.], marg. p. 217, and note 1 ; Abbott on Shipping, 384, and note ; *McArthur* v. *Sears*, 21 Wend. 190, 196, 200 ; *Michaels* v. *N. Y. C. R. R. Co.*, 30 N. Y. 56 ; *Reed* v. *Spaulding*, id. 630 ; *Lamb* v. *Camden & Amboy R. R. Co.*, 46 id. 271.) The evidence was such as to make it the duty of the court to submit the question of negligence to the jury. (*Lamb* v. *Camden & Amboy R. R. Co.*, 46 N. Y. 271 ; *The J. Russell Manuf. Co.* v. *New Haven R. R. Co.*, 50 id. 121.) This court has jurisdiction of the action, and that jurisdiction is not affected by the act of Congress, passed March 3, 1851. (*Dougan's Adm'x* v. *Champlain Trans. Co.*, 56 N. Y. 1 ; *Knowlton* v. *Providence & N. Y. S. Co.*, 53 id. 76 ; *Leon* v. *Galceran*, 11 Wall. 185, 188 ; *Norwich Co.* v. *Wright*, 13 id. 104 ; Conklin's Treatise, 271, note [*a*], [3d ed.], 2 Gallison, 476, note 3 ; *Percival* v. *Hickey*, 18 Johns. 257, 291.) The evidence of the nautical experts was properly admitted. (*Transp. Line* v. *Hope*, 95 Otto [U. S.] 297 ; *Moore* v. *Westervelt*, 9 Bosw. 558 ; *Walsh* v. *Washington Marine Ins. Co.*, 3 Robt. 202 ; *Walsh* v. *Washington Marine Ins. Co.*, 32 N. Y. 427 ; *Price* v. *Hartshorne*, 44 id. 94 ; *S. C.*, 44 Barb. 655 ; *Jackson, etc., Ex'rs* v. *N. Y. C. R. R. Co.*, 2 Ct. & C. 653 ; *Price* v. *Powell*, 3 Comst. 322 ; *Malton* v. *Nesbitt*, 1 Carr. & Payne, 70 ; 11 Eng. Com. Law, 318 ; *Fenwick* v. *Bell*, 1 Carr. & Kir. 312 ; 47 Eng. Com. Law, 311 ; *Sills* v. *Brown*, 9 Carr. & Payne, 601 ; 38 Eng. Com. Law, 245 ; *Thornton* v. *The Royal Exchange Assurance Co.*, Peake's Nisi Prius, 37 ; *Beckwith* v. *Sydebotham*, 1 Camp. N. P. 116 ; 1 Greenleaf, 493.) The questions put to the experts were correct in form. (*Merritt* v. *Seaman*, 6 Barb. 330 ; *Ingraham* v. *Baldwin*, 12 id. 9 ; 5 Seld. 45 ; *Briggs* v. *Smith*, 20 Barb. 409 ; *Schermerhorn* v. *Gregg*, 55 N. Y. 670 ; *Stokes* v. *Johnson*, 57 id. 673 ; *McNaghten's Case*, 10 Clark & Finnelly, 211 ; Wharton on Ev., § 452 ; *Fenwick* v. *Bell*, 1 Carr. & Kir. 312 ;

*Beckwith* v. *Sydebotham*, 1 Camp. N. P. 176 ; *Thornton* v. *Royal Ex. Assur. Co.*, Peake's N. P. 37 ; *Sills* v. *Brown*, 9 C. &. P. 601 ; *Carpenter* v. *Eastern Transp. Co.*, 71 N. Y. 374.) The rule as to the measure of damages was correctly stated by the court to the jury. (Sedgwick on the Measure of Damages [6th ed.], 356, marginal ; *Sturges* v. *Bissell*, 46 N. Y. 462 ; *Black* v. *Camden & Amboy R. R. Co.*, 45 Barb. 40 ; *Sherman* v. *H. R. R. Co.*, 64 N. Y. 254 ; *Ward* v. *N. Y. C. R. R. Co.*, 47 id. 29 ; *Zinn* v. *W. J. Stbt. Co.*, 49 id. 443 ; *Campbell* v. *Wordworth*, 20 id. 499 ; *Renaud* v. *Peck*, 2 Hilt. 137 ; *Crounse* v. *Fitch*, 1 Abb. Ct. App. Dec. 475 ; *Gill* v. *McNamee*, 42 N. Y. 44 ; *Wells* v. *Kelsey*, 37 id. 143 ; *Parrott* v. *Knickerbocker Ice Co.*, 46 id. 361 ; *Wehle* v. *Butler*, 3 J. & S. 1 ; affirmed, 61 N. Y. 245 ; *Jaeger* v. *Kelly*, 44 How. Pr. 122 ; *Allen* v. *Fox*, 51 N. Y. 562 ; *Scherwin* v. *McKie*, id. 180 ; *Richmond* v. *Bronson*, 5 Den. 55 ; *Propeller Mary Vaughan* v. *Steamboat Telegraph*, 2 Benedict, 47 ; *Dana* v. *Fiedler*, 2 Kern. 40 ; *Andrews* v. *Duran*, 18 N. Y. 496 ; *Parrott* v. *Knickerbocker Ice Co.*, 46 id. 361.) The evidence in reference to compulsory pilotage, sought to be introduced by the defendant, was properly excluded. (Code of Procedure, §§ 149, 150, subd. 2 ; *McKyring* v. *Bull*, 16 N. Y. 297 ; *Bogardus* v. *Trinity Church*, 4 Paige, 197 ; affirmed, 15 Wend. 111 ; *Bailey* v. *Johnson*, 1 Daly, 61 ; *Rodrigues* v. *Nelhuish*, 10 Exch. 110 ; 24 L. J. Exch. 26 ; *The Woburn Abbey*, 38 L. J. Adm. 28 ; *The Maria*, 1 Wm. Rob. 105 ; *Atty.-Gen.* v. *Case*, 3 Price, 302.)

MILLER, J. Upon the trial of this action the plaintiffs called several witnesses and examined them as experts, and several questions were put calling for their opinion in reference to the management of the ship by the persons who, it was claimed by the plaintiff, had charge and control of the same at the time when she lay at anchor, and the injury was done by the collision with the collier. One Briggs was called by the plaintiffs as a witness, and after stating that he had followed the sea for many years and commanded vessels running between New

York and Liverpool, testified that he was acquainted with the harbor and anchorage of Liverpool, and that he knew how steamships were coaled while at anchor in that harbor, and that he had heard the testimony read to the jury on the previous day, and the protest; and the testimony of one or two of the witnesses, and the circumstances as detailed by them, and was then asked: " Under the circumstances detailed by these witnesses and in the protest, and when a steamship with a collier alongside of her, begins to drag, with the wind blowing heavily in squalls from the south-west, and the collier working and chafing against the steamship's sides, what, in your opinion, should have been done by the persons in charge of the steamship ? "   The evidence was objected to by defendant's counsel, on the ground, first, as to the general statement " under the circumstances detailed by the witnesses and the protest," and secondly, the question is irrelevant and incompetent, and not a proper question for an expert.   The objection was overruled by the court, and an exception taken by defendant's counsel to such ruling and decision.   The question put called for the opinion of the witness, and allowed him to say what, under the circumstances, should have been done.   In order properly to form an opinion, the witness should have had full information as to the ascertained or supposed state of facts upon which his opinion is based ; and he could not be called upon to determine the truth of the facts sworn to before giving such opinion.   Nor could the witness be called upon to testify unless a clear state of facts appeared ; and it is not his province to draw inferences from the evidence of other witnesses, or to take in such facts as he can recollect, and thus form an opinion. (*Reynolds* v. *Robinson*, 64 N. Y. 589 ; *McCollum* v. *Seward*, 62 id. 316 ;   *The Ann & Mary*, 2 W. Rob. Adm. 195 ; *The Clement*, 2 Curtis' C. C. 363.   See, also, *Carpenter* v. *E. Trans. Co.*, 71 N. Y. 579 ; *Cin. Mut. Ins. Co.* v. *May*, 20 Ohio, 211.) When the facts are controverted or are not entirely clear, a hypothetical question may be put, based upon the facts claimed to have been proved by the evidence. (*Freeman* v. *Lawrence*, 11 J. & S. 288 ; *Dolz* v. *Morris*, 10 Hun, 201 ; *U. S.* v. *Mc-*

*Glue*, 1 Curtis' C. C. 1, 9, 10; *Hoard* v. *Peck*, 56 Barb. 202.) A different rule was laid down at *nisi prius* in *Fenwick* v. *Bell* (1 Carr. & K. 312); but this is in conflict with *Sills* v. *Brown* (9 Carr. & P. 601), and a contrary rule is sustained by other cases, some of which are already cited. Whatever may be the rule elsewhere, the decisions of this State to which we have referred are adverse to the doctrine contended for. In the case of *Trans. Line* v. *Hope* (95 U. S. 297), which is relied upon by the respondents' counsel, the question put was different from those propounded in the case at bar, and involved the experience of the witness as a seaman, which might well be, under the circumstances stated, a proper subject for the opinion of an expert.

The rule, after an examination of the authorities, we think, is that, in a case of this kind, a nautical man cannot be called upon to testify as to his opinion upon evidence given by other witnesses, which covers a great variety of facts and calls for a comprehensive and critical view of the testimony given and the inferences to be drawn from the evidence of the witnesses. In this case, there was a discrepancy between the protest and some of the sworn testimony, perhaps not very important, yet at the same time of sufficient consequence to call for the discrimination of the witness as to the bearing of different parts upon the case, and which might not have been fully appreciated or understood without the attention of the witness being especially directed to the subject and the various facts connected therewith. The whole case depended greatly upon the testimony of experts, and, under the circumstances, we think that the question was an improper one and should have been excluded. A point is made by the respondents' counsel, that no proper objection was taken to the form of the question; and the specific error in form not being pointed out, it must be held to be waived. The objection was distinctly made to the general statement as to the evidence given by the witnesses and contained in the protest, and that the question was not a proper one for an expert, thus calling attention to the form of the question, and was not, we think, required to be more specific.

Some of the other questions put are especially urged as grounds of error; but as the one considered was improperly received, it is not necessary to examine them.

An objection is also made that there was error in excluding the evidence in reference to the owners of the ship being compelled to have on board a pilot who had entire charge of the ship, whose orders the officers and crew were bound to obey relative to the management of the ship, and that, by the law of England, pilotage was compulsory and the owners were exempt from liability for accidents caused by the negligent management of the ship during that period. The defendant's counsel read in evidence different sections of the act to consolidate and amend the provisions of the several acts relating to the Liverpool and Birkenhead docks in the port and harbor of Liverpool, and offered to put the whole act in evidence, alluding to those portions which were material. He also read from section 388 of the Merchants' Shipping Act, which is as follows: " No owner or master of any ship shall be answerable to any person whatever for any loss or damage occasioned by the fault or incapacity of any qualified pilot acting in charge of such ship within any district where the employment of such pilot is compulsory by law," and various decisions of the courts of England giving a construction to the acts in question. The evidence was excluded, on the ground that the defense ought to have been pleaded, and if pleaded, the facts offered to be proved would have been no defense. The evidence of Mr. Inman, an owner and the manager of the defendant's line, showed. that, according to the usage of the port of Liverpool, the captain was not required to be on board of steamers when anchored in the river in charge of a pilot, without reference to the act of Parliament, and that the pilot is in full charge of the ship, and officers and crew are only responsible to obey his orders, and that any disobedience of any proper order given by the pilot would throw the liability for any damage upon the owners. This, however, was contradicted by the plaintiffs' evidence; and, as the evidence stood, it was a question of fact for the jury, whether the pilot had exclusive control and charge of

the ship, so as to exonerate the defendant from liability. Whether the liability of the defendant was affected by the law of England depends upon the application of the statutes and the decisions which were sought to be introduced in evidence by the defendant's counsel as to the facts presented. It appears that the ship had left the dock to finish the loading of her cargo, and to receive coal in the river where she anchored, for the voyage she was about to undertake for the port of New York, in accordance with the usual custom in such cases. A collier came alongside, was secured, and commenced coaling when the accident occurred. From the time of leaving the dock the ship was in charge of a pilot, and she was not ready for sailing until the coaling was completed.

The statutes referred to, so far as they have been presented, do not explicitly state when the vessel became subject to the control of the pilot. The rule, however, as to compulsory pilotage has been the subject of adjudication in the English courts, and none of the decisions hold, that where the vessel is at anchor and has not yet completed her loading and coaling, that the pilot has control of the ship, and the doctrine of compulsory pilotage applies. In *Rodrigues* v. *Melhuish* (10 Exch. 117), the defendant's ship left the docks of Liverpool with a pilot on board, and the plaintiff was engaged to raise an anchor of the ship which she had lost in the river; and in doing so, by the mismanagement and neglect of those on board the ship, plaintiff's boat was injured and sunk. At the time the defendant's ship was at anchor. It was held that assuming that under the Liverpool Pilot Act an outward bound vessel is bound to take a pilot on board, and, under the circumstances, the ship was not proceeding to sea at the time, and that, where damage is done by mismanagement of the vessel, the owners, to exonerate themselves, are bound to show that the accident was occasioned exclusively by the pilot's default. POLLOCK, C. B., said: "If this vessel had all her cargo on board, and the master had been ready to get on board, and she had every thing ready to commence her voyage forthwith, and left her berth with that intention, it might, no doubt, have been said that she was pro-

ceeding to sea from the time she first left her berth." And he concluded that she was not proceeding to sea and the owners are not exonerated. In the case at bar the vessel had not all her cargo on board nor her coal, and lay at anchor for the purpose of receiving a portion of the same. In *The Woburn Abbey* (38 L. J. [N. S.] 28), where the vessel was in charge of a pilot and came to anchor near another vessel, and gave her a foul berth, remonstrances being made, from time to time, by those on board such other vessel, and after a few days the vessels, in swinging to the tide, came in collision, it was held that the owners were responsible for the damage, because while the vessel was at anchor, the employment of the pilot was not compulsory, and even if the pilot had properly moored the Woburn Abbey, the master was not relieved from responsibility. The case was considered as one where the ship had been moored by the pilot for such a length of time as caused him to be *functus officio*, so far as the legal obligation to employ him was binding upon the master. In *The Maria* (1 W. Rob. 105), the owner of a foreign vessel proceeding up the river Tyne with a duly licensed pilot on board, under the Newcastle Pilot Act, was held to be responsible for damage occasioned by the default of a pilot; but it is said that in case of vessels *lying at anchor*, the taking of a pilot on board is optional with the master, but not so with a homeward-bound vessel. The same rule is also held in *Att'y-Gen'l* v. *Case* (3 Price, 302). The effect of these decisions is that where the vessel is not on its passage to or from the port, or at anchor, the law of compulsory pilotage has no application.

In the case of *The Princeton* (Eng. L. R., 3 Pro. Div. 90), a qualified pilot had been employed to pilot a ship from sea into the Mersey, but owing to the state of the tide was unable to dock her that day, and anchored in a clear berth in the river. The next day, the weather being such as to render it unadvisable to take her into dock, she remained at anchor, dragged her anchor and came in collision with a barque. It was held that the owners of the ship were not answerable for the damage, for it was occasioned by the fault of the pilot acting in charge

of the ship when the employment of such pilot was compulsory by law.   The decision was put upon the ground that the ship was *in itinere* and the vessel compelled to remain where she was by *vis major.*

In all the cases cited, the real point considered was, whether the pilot was in charge under the compulsory pilot law; and unless he was so in charge, it is held that upon no principle could the owners be excused from liability.   In the case at bar, the vessel was not ready for sailing; and as there was no legal obligation to employ a pilot, and he was not necessarily there, the defendant was not released from responsibility.   To constitute a defense, it was essential that the pilot should have been actually and necessarily engaged in the discharge of his duty in piloting the ship out of port.   Such was not the case, as we have seen, and hence the evidence was incompetent.   The conclusion at which we have arrived renders it unnecessary to consider whether the defense should have been set up by answer and was only available in that form.

The rule laid down by the judge as to the damages is also claimed to have been erroneous.   On this subject the judge charged that the evidence which had been offered of the sale of the goods at public auction was proper evidence to be received of the value of the goods, and said : " But still the law regards any such public sale of which notice has been given as, in itself, affording fair evidence of the value of the property sold, if not countervailed by that which is of a different character, such as a fair estimate or appraisement.   Under these circumstances, the plaintiffs, if they are entitled to recover, are entitled to recover the fair market value of these goods immediately after their arrival in New York, less what was fairly realized from those sold at public sale, of which notice was given."   The defendant excepted, and the judge was requested to charge that the sale at auction was not conclusive evidence of the damage value of the goods; and he added that it was not, and that he would regard it as doubtful if there were no more reliable estimate or appraisement, and that the sale at public auction, upon due notice given, is evidence of what the

damaged goods were fairly worth, in the absence of any other evidence to control it.  To this qualification an exception was also taken.

The question then arises, whether the sale of the goods at auction, under the circumstances, furnishes evidence of what the goods were actually worth, or any lawful guide as to the measure of damages.  In case of a sale by a sheriff, which the statute provides shall be conducted in a certain manner, the price paid is some evidence of value.  (*Campbell* v. *Wood-worth*, 20 N. Y. 499; *Gill* v. *McNamee*, 42 id. 44.)  This rule has also been held in reference to private sales of property. (*Wells* v. *Kelsey*, 37 N. Y. 143; *Crounse* v. *Fitch*, 1 Abb. Ct. of App. Dec. 475.)

The qualification, therefore, of the judge to the request, to the effect that it was evidence of what they were fairly worth, in the absence of any other evidence, was not strictly accurate. As, however, this exception was general and the defect not pointed out, we are inclined to think the exception was insufficient.  The point is made, however, that the defendant should have had notice of the sale, so as to protect the goods from being sacrificed.  There is no rule that prevents such evidence being given for want of notice of the sale.  There was other evidence as to the value of the goods; and the most which could be claimed as to the evidence of the sale at auction is that it was some evidence for the consideration of the jury.

The motion to dismiss the complaint was properly denied, as the evidence of the witnesses who testified as experts tended to show negligence on the part of the defendant's officers in the management of the ship, and was sufficient to authorize a submission of the case to the jury.

The other questions raised upon the trial it is not important to examine ; and for the error already stated the judgment should be reversed and a new trial granted, with costs to abide the event.

All concur, except Earl, J., who did not vote.

Judgment reversed.