# ISRAEL LOVELADY vs. THE STATE.

COURT OF APPEALS, TYLER TERM, 1883.

*Practice—Evidence—Expert Testimony.*—While it is improper to allow hypothetical questions having no foundation in the evidence adduced, it is not essential that counsel in his examination of an expert witness shall state the facts as they have been proved. In propounding his hypothetical questions he is authorized to assume the facts in accordance with his theory of them. The failure of such assumed facts involves the failure of answers based upon such questions. See this case for the principle illustrated.

*Same—Murder—Corpus Delicti.*—In prosecutions for murder it is incumbent on the State to establish the *corpus delicti* in its entirety, which consists of, first, a criminal act; and second, the defendant's agency in the commission of such act; whereunder, the burden of proof is upon the State to show first the death of the party alleged to be dead, and that death was produced by the criminal act of some one, and was not the result of accident or natural causes, and that the defendant committed the act which produced the death. This proof can be made by circumstantial evidence.

*Same—Confession.*—Death, and that death was produced by criminal agency are concurrent elements of the *corpus delicti* which must be already shown before a conviction can be had alone upon the confession of a defendant.

Appeal from Wood County.

Opinion by Willson, J.

1. It was not error to permit the State's witness, Dr. Skeen to answer the hypothetical question propounded to him by the district attorney. That question was as follows: "Suppose that a person should strike another on the back of the head, at the place described by you, when the skin was off the size of a dollar, with the large end of an iron wedge sufficently hard to tear off the skin, and open the wound to the skull and produce a wound down the back of the neck several inches long, so that the blood would settle there, would such a blow produce death?" The witness answered as follows: "Of course such a blow would produce death instantle. As this particular portion of the cranium is the seat of life, a concussion here will injure the spinal column and produce paralysis and death." It was objected to the question that it was hypothetical, and not based upon a state of facts already in evidence; and that it did not involve a question of science or skill such as would warrant the admission in evidence of the opinion of the witness. In putting hypothetical questions to an expert witness counsel may assume the facts in accordance with his theory of them; it is not essen-

tial that he state the facts to the witness as they have been proved. Guiterman et. al., vs Liverpool etc., St. Ship Co., 83 N. Y., 358. Conley vs. The People, Id., 464; 1 Greenl. Ev., 440.

Of course, as stated by Mr. Wharton, if the facts on which the hypothesis is based fall, the answer falls also. Whar. Cr. Ev. 418. Nor would it be a proper practice to allow hypothetical questions having no foundation whatever, in the evidence in the case. In the case at bar, the witness was shown to be a medical expert, and it was further shown that there was a severe wound upon the back of the deceased's head, which could have been inflicted with an iron wedge, and that an iron wedge was found near the body of the deceased shortly after her death. We cannot say that the hypothetical question objected to, had no foundation in the evidence in the case. It was the theory of the prosecution that deceased was killed by a blow inflicted upon the back of her head with an iron wedge in the hands of the defendant, and it was proper to permit this theory to be supported by the hypothetical question objected to. As to the other objection to the question, it is also untenable. This precise question is discussed and settled in Waite vs. State, 13 Tex., Ct., App., 168, in which case the authorities in support of the admissibility of such evidence is cited.

11. We now approach the principal and most difficult question in the case. It is the sufficiency of the evidence to support the conviction. Is it of that cogent, satisfactory and convincing character which the law demands to sustain a conviction of crime ? It is unnecessary for us to recapitulate the rules of law in regard to the nature, strength, sufficiency &c., of circumstantial evidence. They have been so often and so fully stated and explained in previous decisions, that we need only refer to the case of Pogue vs. State 12 Tex., Ct., App., 283, where the authorities upon the subject will be found cited. In prosecutions for murder the State must establish clearly and satisfactorily the *corpus delicti*. This *corpus delicti* consists of two things; first, a criminal act; and second, the defendant's agency in the commission of such act. Thus is the case at bar the burden of proof was upon the prosecution to establish first, that Anna Lovelady was dead; that her death was not the result of accident or natural causes; and second, that defendant committed the act which produced her death. Whar. Cr. Ev., Sec. 325; 1 Bish. Cr. Proc. Sec. 1056.

Mr. Wharton says : "It has been already stated that the *corpus*

*delicti* includes two things; first the objective, and then the subjective elements of criminality; in other words; first, that the overt act took place; secondly, that it took place through criminal agency. Of homicide therefore it must be held essential to a conviction, first, that the deceased should be shown to have been killed; and secondly, that this killing should have been proved to have been criminally caused. And on the well known principle that in capital cases this criminal agency of the defendant cannot be proved on his confession alone, without proof of the *corpus delicti*, it must not only be shown, to justify a conviction in such case, that the deceased was dead, but that her death was criminally produced. Unless the *corpus delicti* in both of these respects is proved, a confession is not by itself enough to sustain a conviction." Whar., on Hom., Sec, 641. It is perfectly competent to establish the *corpus delicti* by circumstantial evidence, (1 Bish., Crim. Pro., 1057;) but as is well said by Mr. Bishop; "Special care should be exercised as to the *corpus delicti*, and there should be no conviction where this part of the case is not proved with particular clearness and certainty.". 1 Bish. Cr. Pro. Section 1059.

What is the evidence relied upon by the prosecution in this case to establish the *corpus delicti*? We will refer to it, and analyze it in detail. It establishes, beyond any boubt, the death of Anna Lovelady. This part of the *corpus delicti* is therefore beyond any controversy. What caused her death? This is the first question to be solved, and unless it is clearly and satisfactorily settled by the evidence that the death of Anna Lovelady, was produced by the criminal act or agency of some person other than herself, we need proceed no further with the consideration of the case; for if this important matter be left in doubt, the foundation of the prosecution is fatally insufficient, and the superstructure cannot stand. It is shown by the evidence that the deceased was in an advanced state of pregnancy, that she had been in a delicate state of health for some months prior to her death; that she had been afflicted with excessive hemorrhages from the womb; that she was under the treatment of a physician and had for several months been threatened with abortion; that she was weak and unable at times to walk about the house without help; that on the day of her death she had been taking medicine prepared by her physician; that on the night of her death she complained of being worse, and in much pain; that she had not finished taking all

of the medicine prescribed by her physician; that he had prepared six doses of powders for her to take; that she had taken two of the doses leaving four yet to be taken, and they were upon the mantel piece over the fireplace. When her dead body was found it was upon the floor of the house, in front of the fireplace and near to it; the clothing had all been burned off the body and the body itself was terribly burned; the hair was all burned from the head, and the body was in places, both on the back and in front, burned to the hollow, and the breasts were consumed by the fire. Bruises and wounds were discovered upon the body—one of the cheeks was badly bruised; there were two cuts on the top of the head crossing each other at right angles, which were apparently produced by some sharp instrument, where the head joins the neck. This wound laid bare the skull, and was as large as a tsilver dollar, and the blood in the region of it and extending for several inches down the back had coagulated, discoloring the body at that place. None of the wounds upon the head produced a fracture of the skull. A physician—an expert—testified that the cuts upon the top of the head were not sufficient to produce death, or to stun or fell the deceased, but that the wound upon the back of the head was sufficient to cause death. This physician also stated that he did not know what caused the wound at the back of the head. He had examined the wounds and he says:"I am now and have always been undecided as to how any of the wounds came there. It may have beed done by a fall or burn. It is possible that it may have been done by the fire. I am unable to decide how, satisfactorily, to my own mind." Again he says : "The settling of the blood, down the neck and back of deceased, may possibly have been produced by the burn alone. The burn on the deceased at the back of the head, also between the shoulders on the back, and that on the breast and face, would have produced death almost instantly without any other cause." This constitutes the only expert testimony as to the probable cause of the death of the deceased. What does it establish ? Nothing more than that there were wounds upon the body which might have been produced by violence inflicted by another, or by an accidental fall, or by burning. There is no certainty in testimony like this, and it is entitled to but slight consideration. This expert was present soon after the death, and examined the dead body and the surroundings, and he candidly admits, and states in his testimony, that his mind has never been satis-

fied as to how the wounds upon the body were produced. We certainly cannot hold that the testimony of this witness establishes the essential fact that the death of the deceased was caused by the criminal act of another person. What other evidence is there in the case tending to establish that fact ? It was proved that some months prior to the death of the deceased, her husband, the defendant, had ill-treated her, had in fact struck and kicked her; that her death occurred early in the night, between eight and nine o'clock; that the bed, upon which the defendant claimed to have been sleeping on the night of her death, was found to be smooth and unrumpled when the neighbors reached the scene on that night; that there was an iron wedge found in the house that night, which instrument was capable of inflicting such wounds as were found upon the body of the deceased; that the children who were claimed by the defendant to have been asleep in the house at the time of the tragedy, were up and dressed,and had on their shoes when the nearest neighbor reached there that night; that the body of the deceased was cold and stiff when the neighbors reached it between eight and nine o'clock at night, and that there was no fire in the fire-place except a bed of live coals. We have recited in substance every fact testified to, as presented in the record before us, which in our judgment even remotely tends to prove that the death of deceased was caused be the criminal act of another. We are not called upon, however, to determine this question. Much of this evidence which might otherwise appear inconsistent with the innocence of the defendant is to our minds explained in a manner that very much weakens its cogency. Thus it is shown that there was a live bed of coals of fire in the fire-place on that night; that the fire-place was a large one; that the hearth was lower by four or five inches than the floor of the room; that there was a mantel-piece above the fire-place on which were the four doses of medicine which the deceased had yet to take; that after her death three only of the doses of medicine were found upon the mantel; that the back and jambs of the fire-place were brick, and the brick were broken out of the back and had fallen into the fire-place; that there were two broken andirons in the fire-place, and one or two old plough shares. It is the theory of the defense that the deceased got up from the bed, went to the fire-place to get a dose of medicine, swooned and fell into the fire, and that the wounds upon her body

were produced by falling upon the broken andiron, plowshares and brick in the fire-place, or by the action of the fire.

Is this theory improbable or unreasonable when propounded upon this state of facts ? Might not such an accident occur under such circumstances ? It was proved, that the iron wedge which was found in the house, had been kept there to prop open the door, and that it was carefully examined and no blood or other indication of having been used in inflicting wounds were found upon it.

It was claimed by the defendant that when he awoke the body of deceased was in the fire and burning, and that he pulled it from the fire on to the floor, and in doing so burned his hands severely, and that he also procured water and threw it upon the body to extinguish the fire.

In corrroboration of this it was proved that a bucket with water in it was sitting near the body; and that the defendant's hands were severely burned. It was also proved by the thirteen year-old daughter of the defendant, who was in the house on that night, that when she awoke the house was filled with smoke, and she awoke her father, and he sprang out of bed, and pulled the body of deceased out of the fire &c.

In regard to the bed in which the defendant claimed that deceased and himself were sleeping on that night being smooth and unrumpled, there is no explanation in the evidence. The condition of the bed is testified by but one witness, and there is opposed to this testimony the positive testimony of the defendant's daughter, that her father and deceased had gone to bed in that bed, and also by the statements of the defendant which were admitted in evidence as part of the *res gestae.*

After a very careful consideration of all the evidence we find our minds in the same condition as that of the physician, Dr. Skeen.

We are unable to determine, from the facts before us, in what manner or by what means the death of the deceased was produced; whether by natural causes, accident or criminal act of another person. There is certainly, in the evidence presented to us, not that moral certainty—that conclusive force that death was produced by the criminal act of another which the law in all such cases imperatively demands in support of a conviction.

We must presume the defendant innocent until his guilt is established by competent evidence beyond any reasonable doubt. This

presumption of innocence must be met and overthrown by the State, if overthrown at all, not by mere possibilities, probabilities, conjectures, or suspicious circumstances, but by clear, forcible, consistent and satisfactory evidence, which excludes from the mind every reasonable doubt arising from the evidence of the defendant's guilt. In this case we are compelled to say such is not the character of the evidence relied upon by the State to support the conviction.

We always hesitate to distrust the verdict of a jury upon the facts of a case, and never do when there is suffiient evidence to sustain the verdict, even when the great preponderance of evidence is against the verdict. But when, in our judgment, the evidence is wholly insufficient to support a conviction, when it falls short of the positive demands of the law and of reason, where it leaves the issue of guilt in great doubt, and presents a reasonable theory of defendant's innocence, as we think it does not in this case, this court and the supreme court of the State have uniformly considered it not only within their province, but their imperative duty to interpose between the State and the citizen, and guarantee to the latter a fair and impartial trial in accordance with the full measure of the law. By pursuing this course guilty persons may, and do sometimes escape the punishment they deserve, but it is far better that it be thus, than that the innocent should be condemned. Believing that the evidence in this case is sufficient to establish the *corpus delicti*, in that it fails to satisfactorily prove that the death of the deceased was caused by the criminal act of another, it becomes unnecessary for us to consider the case further, and the judgement is reversed and the cause remanded for another trial.

Reversed and remanded.