# COURT OF APPEALS OF TEXAS.

## TYLER TERM, 1883.

[No. 1476.]

## ISRAEL LOVELADY *v.* THE STATE.

1. PRACTICE—EVIDENCE—EXPERT TESTIMONY.—While it is improper practice to allow hypothetical questions having no foundation in the evidence adduced, it is not essential that counsel in his examination of an expert witness shall state the facts as they have been proved. In propounding his hypothetical questions he is authorized to assume the facts in accordance with his theory of them. The failure of such assumed facts involves the failure of the answers based upon such hypothetical questions. See the opinion *in extenso* for a theory authorized by the facts in proof, and for a hypothetical question and answer admissible thereunder.
2. SAME—CIRCUMSTANTIAL EVIDENCE.—In *Pogue* v. *The State,* 12 Texas Court of Appeals, 283, a general rule is correctly laid down as follows: "When circumstantial evidence only is relied upon to convict, it must be such as to exclude, to a moral certainty, every hypothesis but that of the defendant's guilt of the offense imputed to him."
3. SAME—MURDER—CORPUS DELICTI.—In prosecutions for murder, it is incumbent upon the State to establish the *corpus delicti* clearly and satisfactorily. This *corpus delicti* consists of, first, a criminal act; and second, the defendant's agency in the commission of such act. The burden of proof in the present case was upon the State to show, first, the death of the party alleged to be dead, and that the death was produced by the criminal act of some one other than the deceased, and was not the result of accident or natural causes; and, second, that the defendant committed the act which produced the death. The *corpus delicti* may be established by circumstantial evidence.
4. SAME—CONFESSION.—Death, and that the death was produced by criminal agency, are concurrent elements of the *corpus delicti,* and must be clearly shown before one accused can be convicted upon his confession alone.
5. SAME—FACT CASE.—See the opinion and the statement of the case fo evidence held insufficient to support a conviction for murder in the first degree, in as much as it fails to show that death was the result of a criminal agency.

I 1

APPEAL from the District Court of Wood. Tried below before the Hon. J. C. Robertson.

The indictment in this case was presented on the twenty-sixth day of May, 1882, and charged the appellant with the murder of Anna Lovelady, who from the evidence appears to have been his wife, in Wood county, Texas, on the thirtieth day of January, 1882, by striking her with an iron wedge, a hatchet and a knife, and by throwing her bodily into a fire, wherein she was fatally burned. The trial, which was had on the twelfth day of December, 1882, resulted in the conviction of the appellant for murder in the first degree, with a life term in the penitentiary assessed against him as punishment.

T. B. Browning was the first witness introduced by the State. He testified, in substance, that he was at the time of the death of Mrs. Lovelady, in January, 1882, a tenant of the defendant, and had then known him and the deceased about two years. The house then occupied by the witness stood about two hundred yards from that occupied by the defendant. On the night of the death of Mrs. Lovelady, between the hours of eight and nine, the witness, who, with his family, had gone to bed, heard the defendant calling to him, saying, as he understood him, "Ben! Oh, Ben! Come here. My house is on fire." The witness dressed rapidly and went to the defendant, whom he found standing at his fence some twenty yards from his house. He found the defendant wringing his hands, one of which he had wrapped in a white cloth, and crying. The witness asked him what was the matter, and he replied that his wife had fallen into the fire and had burned up.

The witness thereupon went into the house and found Mrs. Lovelady dead, lying back down and naked. Her head lay within one or two feet of the hearth; her feet lay extended towards the centre of the room, and her arms were turned up at the elbow and looked stiff. The body lay angling rather than straight, and was badly burned. Neither lamp nor candle was burning, nor did the witness notice any smoke in the room. A bed of live coals, such as are produced by consumed sticks of small dimensions, was burning in the fireplace. Two or three unconsumed sticks of small size were on the coals. The witness prepared to go for John Richards, a neighbor who lived some two hundred yards away, but the defendant told him that neither Mr. nor Mrs. Richards was at home, and requested

him to go for Mrs. Jenkins, another neighbor, which the witness did, and returned. The room in which the dead body lay was about sixteen by eighteen feet in size and had two doors, one of which opened into a shed room. The deceased was the defendant's third wife, had been married to him about ten or eleven months, and at the time of her death was about seven months advanced in pregnancy. The defendant had three children by his first wife, the senior being then about twelve years old.

On his cross-examination, the witness stated that he and his family were asleep when the defendant called to and awakened him on the night in question. He could not be positive, but thought that it was near nine o'clock when he was awakened. When the defendant met the witness at his fence he placed his two hands upon the witness's shoulders and said, in answer to the witness's question, that his wife had fallen into the fire and burned. He was then crying, or appeared to be. The fireplace spoken of was deep, and about three and a half or four feet wide. The chimney was constructed of earth and sticks, with the back and jambs of brick. The opening of this chimney in front was about four feet from the level of the floor. It was about two feet deep to the back, and it was about eighteen inches from the end of the floor to the jambs. The hearth had sunk down from three to five inches and was very uneven.

The witness, after he returned from Mrs. Jenkins's, was requested by the defendant to go to Winnsboro and notify Mr. Carlock, the coroner, of the death of his wife, and to request his presence with a physician to hold an inquest. He requested also that the witness *en route* should go by Dock Lovelady's house and notify him. Accompanied by Jesse Robinson, whom the defendant provided with a horse, the witness complied with this request. As he and Robinson started they met Mr. Crane, who told them to charge Mr. Carlock to come to the house without fail, and to bring two good physicians. When the witness reached the defendant's house on his return, day had just broken, and a large number of people had collected. All of this occurred in Wood county, Texas.

James Grant, the second witness for the State, testified that he had resided in the northern part of Wood county between fifteen and twenty years. He was, however, a stranger in the neighborhood of the defendant's house at the time of Mrs. Lovelady's death. He was at the house of Mrs. Jenkins when Browning came for her on that night, and at the time was sit-

ting by the fire with the family. He accompanied Mrs. Jenkins
to the defendant's house. This was about nine o'clock. When
he and Mrs. Jenkins arrived at the defendant's house, the de-
fendant was standing on his gallery, dressed. He had on hat,
pants and boots, but no coat. Three children, dressed, were
standing near the back of the house. The deceased was lying
on the floor near the fireplace with her limbs extended towards
one of the beds. The limbs, except the feet, were then covered
with a sheet. One bed was rumpled as though it had been oc-
cupied. The other, and remaining one, had the cover smoothly
turned down as though it had been prepared for occupation. It
did not look like it had been occupied since it was made up. A
bucket half filled with water sat within four feet of the body.
A large load of split wood was on the fire, and was slowly burn-
ing when the witness reached the house. It soon ignited and
burned well. The witness remained with the crowd at the house
all night. He had not previously known the defendant or the
deceased.

Doctor T. N. Skeen, a graduated physician, was next intro-
duced by the State, and examined as a witness and an expert.
He testified that in January, 1882, he was called upon by coro-
ner Carlock to make a *post mortem* examination of the body of
Anna Lovelady. He reached the defendant's house about two
o'clock on the day after her death, and began the examination
about three o'clock, in the presence of the jury of inquest. The
body had then been laid out, washed and dressed. Examination
disclosed that the head, breast, the upper part of the back, arms
and hands had been badly burned, in some portions to a crisp.
On the left side of the cheek and near the ear, the witness found
a small but deep, though not dangerous, wound, about which
the blood had settled, showing that it was inflicted by a blow or
fall. The witness could not determine whether it was an old
wound or one of recent date. The hair had been burned from the
head. The witness found a second wound on the back of the
head, just above the roots of the hair. This was a deep bruise
as large as a man's hand, extending down the back. The blood
had settled about it, and down the back and spinal column for
several inches. The skin was broken to the skull, leaving the
skull bare over a space as large as a silver dollar. This wound,
produced by whatever cause, whether by a blow, fall or effect
of fire upon this part of the head, would have caused instanta-
neous death.

On the top of the head the witness found two cuts crossing each other at right angles. The one extended from the front to the rear and was about three inches long. The other, about two inches long, crossed the first, running direct in a line from ear to ear. These two were well defined smooth cuts to the skull, and gaped open along the edges. The corners at the crossing point turned up. They were cuts to the skull, but not such as would produce death, nor even such as would stun or fell the deceased. They appeared to have been inflicted with some sharp instrument. The witness was of the opinion that they were insufficient to stun deceased, because the skull was not fractured, and because no blood had settled about them. Neither the wound on the cheek nor those on top of the head produced death, but, in the opinion of the witness, death resulted from the wound on the back of the head.

Upon his cross-examination the witness reiterated that he did not regard the wounds on the cheek and on the top of the head as dangerous wounds, and they did not, in his opinion, contribute to the death of Mrs. Lovelady. He did not, at the time he made the examination, nor did he yet know, what caused the wound on the back of the head. He was and is still undecided as to how that wound was inflicted. It might have been inflicted by a fall or a burn. He could reach no conclusion about it that would satisfy his own mind. The skin, to the size of a silver dollar, was broken from this wound, and the skull was exposed just above the roots of the hair, where the skin over the skull is about one-sixteenth of an inch thick. The parts at this point were badly scorched and burned. The witness cut them away and found that blood had settled and coagulated near by and down the back for several inches. It was possible that this condition might have been produced by the action of the fire alone, the effect of a burn being to stop the blood and cause it to coagulate as it does in a bruise. The wound appeared to the witness more like a bruise than anything else. At this point the hypothetical question and answer quoted in the opinion were objected to and admitted.

Re-crossed by the defendant, the witness deposed as follows: "I have already stated that blood will settle and coagulate in the region of a severe burn just as it will in the region of a bruise. The settling of the blood down the back and the neck of the deceased may possibly have been produced by the burn alone. The burn on the back of the head, that between the

shoulders on the back, and that on the breast and the face, would, in this instance, have produced almost instant death, without any other cause. The deceased was terribly bruised; her face was burned to a crisp; her nipples were burned off, and she was burned to the hollow or inside both from the breast and the back, and would have died from this cause if there had been no other."

John Richards, the next witness for the State, testified that at the death of Mrs. Lovelady he resided on the defendant's place, about one hundred and fifty yards from the defendant's house. He went to the defendant's house that night about nine o'clock, and saw the defendant at his fence. He was then making a noise as though weeping, but the witness saw no tears. Witness heard several persons talking about sending for a coroner to hold an inquest, but did not know who made the suggestion. He heard Crane say that if it was his case he would send to Winnsboro for coroner Carlock and two of the best physicians to be had, and have the matter investigated. The defendant, in reply, complained that to procure two doctors from Winnsboro would involve him in too much expense, and suggested that Doctor Pevey, who lived some two miles distant, be sent for. A little later than this, the defendant invited the witness to walk with him a short distance from the house, where he asked the witness, "What in the d—l do you suppose Captain Crane wants with a coroner's jury and two doctors from Winnsboro?" When the witness saw the body of the deceased it was wrapped in a sheet and lay on a plank in the back of the house.

Cross-examined, the witness stated that he and his wife left home on the Saturday before Mrs. Lovelady's death, which occurred on Monday, and the defendant knew that fact. Witness and his family were the neighbors nearest to the defendant at the time of the death of his wife. The witness did not know whether or not the defendant was actually weeping at the fence. On the next day, before the body was removed for burial, the defendant "got to carrying on"—cried or pretended to cry. Witness saw no tears, and to him the defendant did not appear like a man weeping. The defendant went to the grave with the burial party.

W. L. Stevenson next testified, for the State, to the effect that he lived near and worked for the defendant in 1881. He did not know that the defendant had any weapon about his place at the time of the death of his wife. He had an iron wedge, a

hatchet and a pocket knife about his premises in 1881. The witness did not know that the deceased at any time left the defendant, though he was so informed by the defendant himself. The deceased came to the house of the witness during the fall of 1881 and got an umbrella, at which time the witness understood that she was leaving him. About plowing time during the summer of 1881 the defendant slapped the jaws of the deceased. The defendant told the witness that his wife quarreled at him for not helping her cook; that he tried to help her cook and undertook to grind some coffee, when his wife grabbed him and he threw her off; that she grabbed him again and he spilled the coffee, whereupon he slapped her jaws and she fell against the smoke house.

Cross-examined, the witness stated that he heard the slap given by the defendant to the deceased. He, the witness, was sitting on his gallery at the time, from a hundred to one hundred and fifty yards distant from the defendant. He did not and could not see the slap from where he was. He did not know that it was the defendant who did the slapping, or that it was the deceased who was slapped, until, as above stated, the defendant told him in the fall. At this point the witness was confronted with his written testimony given before the examining court, which on the subject in hand reads as follows: "I was coming through the field belonging to Captain Crane and heard a racket or noise toward Mr. Lovelady's house, and heard him slap his wife's jaws and her crying afterwards." Asked to explain and reconcile these two statements if he could, the witness replied: "I know I was sitting on my gallery leaning back against the wall. Captain Crane's field is near defendant's house, and I there heard the noise as I walked along, and when I got home I heard the lick or slap."

The witness stated that, as he had a defective memory, he could not now say exactly how the defendant came to confess to him that he had slapped his wife's jaws. It came about, however, in this manner: The witness went into the woods, about a quarter of a mile from the defendant's house, where the defendant was cutting blocks for house sills, and the defendant told him about the matter in the manner related in his testimony in chief. This was the only time defendant had ever told him about it. The witness was here requested to reconcile this statement with the one he made before the examining court, which was read as follows: "The defendant told me that he slapped

his wife's jaws. He came to our house and there told me that he slapped her jaws the summer before; that she grabbed him while he was grinding coffee and caused him to spill it, when he slapped her jaws and slung her up against the smoke house." The witness stated that his memory was bad and he could not explain the variance between the two statements. He was not mad at the defendant. On Saturday before the death of Mrs. Lovelady the witness attempted to obtain credit in Winnsboro, but was refused in default of an order from the defendant. The witness bought no goods on that day, nor did he utter threats against the defendant. He sent his mother to the defendant when he got home on that Saturday night, but made no threats. The witness left the defendant's premises and did no more work for him.

Green Pevey, the defendant's family physician, testified, for the State, that he was called to treat the deceased about the middle of September, 1881, and made one or two visits between that time and her death. She was a strong, healthy woman, but was then pregnant, and in the course of nature would have given birth to a child within two months later than the time of her death. About the middle of September, 1881, she came to the witness's house, sobbing and weeping, and apparently in great distress. She complained to the witnes of a bruise on her left side. She remained at the witness's house that day and night, and next day until evening, when the witness persuaded her to return to her home, which she did, or at least she started in that direction after the witness refused her request to remain at his house until she should recover from her bruised side. She was then suffering from hemorrhages of the womb, caused, the witness believed, by the bruise on the side, which then seriously threatened abortion. The witness treated her for this disarrangement, off and on, up to the day of her death, and prevented abortion with great difficulty. Up to the time that she received this bruise she was free from hemorrhage or other symptom of abortion.

The witness did not examine the bruise on the day that the deceased came to his house and informed him of it, but within a month or two thereafter the witness visited her and examined it. It was then about the size of a silver dollar, and was of a blue or dark color. The witness treated her for hemorrhage of the womb for four or five months and up to the day preceding her death. She and the defendant were separated on the occa-

sion of her visit to the witness, but they afterwards became reconciled and lived together. The witness attended upon her on the day before her death, by direction of the defendant, and left six doses of Dover's powders for her to take, leaving directions as to how they should be taken. The witness knew the deceased before her marriage to the defendant, when she was Miss Anna Wood. She lived with the defendant then, who waited on her and paid her bills—at least he paid her doctor's bills. The defendant always appeared to be a kind and affectionate man to his wife and family, so far as the witness, who had good opportunities for doing so, could judge. The families of the witness and the defendant were intimate. The six powders left with the deceased by the witness were intended to allay pains and to prevent abortion.

Mrs. Lizzie Richards, for the State, testified that in October, 1881, the deceased passed her house, weeping bitterly. On the Sunday week before her death, the witness called upon her at the house of the defendant, and found her sitting by the fire weeping. She displayed, and complained very much of a red bruise on the side of her face near the ear. She had her head tied up, but exhibited the bruise to the witness. The defendant was not in the house at the time. On the Friday following the deceased was at the house of the witness, and the bruise was not then visible. On Saturday, which was two days before her death, the defendant passed the house of the witness very early after daylight, going from home. Some hours later, at about eleven o'clock, the witness saw the deceased going towards her home. She was weeping violently and seemed in great distress. She said she was going then to get her clothes. Mrs. Stephens, a neighbor, persuaded the deceased to remain and not to leave the defendant.

Cross-examined, this witness stated that she did not see the deceased leave home on the Saturday before her death—only saw her as she was returning. Witness did not know of her own knowledge that the deceased had then separated from the defendant.

Mrs. Etha Browning testified, for the State, that she went to the defendant's house on the night of the death of Mrs. Lovelady. She saw no weapons at the house. She saw, but did not particularly notice, an iron wedge which was picked up near the bed. She also saw some smoothing irons, but saw no hatchet or knife. The deceased was at the house of the witness

some time during the fall before her death. She came one evening during the absence of the witness, and the witness did not see her until next morning. She said that she came from Doctor Pevey's. When she met the witness next morning she threw her arms around the witness and wept violently and begged the witness to go home with her. She at the same time showed the witness a bruise on her side, of which she complained very much. It was then uncovered, having neither plaster nor medicine on it. After remaining at the house of the witness for a while the two started to the defendant's house. When they got there the defendant was in the field, but being called by one of the children, he came to the house, when the deceased, who was then crying, told him that she had come for her things and was going to leave him forever. The defendant began crying and begged her not to leave him. The deceased replied that he had so abused her she could not live with him; that he had kicked her out of the door and made that bruise on her side, which had nearly killed her; that he had always imposed upon her, and made his daughter Luella abuse and mistreat her; that if she remained with him he would eventually kill her. She told the witness in the presence of the defendant that the defendant was good and kind to her in the presence of company, but at other times was abusive and cruel. The defendant did not deny or reply to any of these reproaches, but hung his head, and appeared to be crying. Witness left the deceased talking, and both of them crying.

Cross-examined, the witness stated that she looked at the bruise on the morning of the occurrences deposed to. It was on the side, above the hip, and appeared to be nearer the back than the stomach. The deceased then walked without assistance, and did not appear crippled. She did not limp. The witness accompanied her to her house at her request.

W. F. Richards testified, for the State, that he reached the defendant's house on the night of his wife's death at about nine o'clock. While the crowd were standing about the fire discussing what was best to be done, Captain Crane suggested that the coroner and two of the best doctors in Winnsboro be sent for. The defendant, in an aside, asked the witness, "Why in the d—l does Crane want the coroner and two doctors?" The witness thereupon called Crane, and the defendant said that two Winnsboro doctors would cost too much—that Doctor Pevey, who lived near, would answer every purpose. The defendant

had both hands wrapped up, and complained more of them than anything else.

During the night the witness asked the defendant for an account of his wife's death, and heard him give three separate and different accounts of it. One of the accounts was to the effect that all of his family had gone to bed, himself and his wife sleeping together; that some time after he retired his daughter Luella aroused him, when he found the house full of smoke; that he sprang from his bed, opened the door and then discovered his wife in the fire and pulled her out. A second account of it which he gave to Willis Richards was that when his daughter awakened him, he immediately discovered his wife in the fire, her clothes burning, when he pulled her out. His third account was that, when aroused, he was enabled to see his wife in the fire by a small blaze, when he sprang up, dragged her out and then opened the door and gave the alarm. During the night the defendant "took on and made a great fuss" over his hands. Just before day the defendant requested the witness to select a convenient place to bury the body, and to get it interred as soon as possible. This was after Browning and Robinson had returned from their trip to Winnsboro after the coroner. The witness did not see the deceased until she was taken from the fireplace and laid out.

C. B. Gorman testified, for the State, that as one of the coroner's jury, in company with Mr. Carlock and Doctor Skeen, he reached the body in the afternoon on the day following the death. The witness assisted Doctor Skeen in making the examination, and first called the Doctor's attention to the bruises on the face, head and neck. The bruise just below the cheek bone was nearly as large and wide as the witness's hand. It was a very severe bruise, blue or black of color, and extended below the cheek bone. The Doctor lacerated the bruise, disclosing, after cutting through the bruised parts, white flesh that resembled pork fat. The black spot on the back part of the head commenced just above or a little below the point where the hair is usually "done up." It was longer than a man's hand, and ranged down the back of the neck between the shoulders, and immediately over the back bone. At its topmost point a space the size of a silver dollar was cut to the skull. The bruise itself was very deep, the flesh was reduced to a jelly or mush, and was black with bruised blood. This condition was confined to the circle of the bruise. When the knife passed from this circle

the flesh as to color and solidity appeared natural. The cuts on the top of the head formed a complete cross, and were well defined, clean and clear, and conformed to the description given by Doctor Skeen. No bruises, black or mashed spots, were found near the cross cuts.

The chimney to the fireplace was constructed of sticks and earth, except the back, jambs and hearth, which were of brick. The hearth had sunk some four or five inches below the level of the floor. There were no rough places anywhere about the fireplace. The fireplace contained two old andirons, the end feet of which were broken off. The andirons, though somewhat rough at their broken parts, had no sharp edges. The witness examined for but found no weapons, other than an iron wedge, such as are in use for splitting wood or rails. This was either a new one or it had been recently "set." Its head was square and unbattered, and the point so sharp for an iron wedge that the witness believed that it had never been used in splitting wood. The witness examined but found no blood on the wedge, or elsewhere in the house, save a very little on the hearth.

Cross-examined, the witness stated that the wound on the back of the head was at least three inches wide. He inserted his finger to the distance of an inch or more and extracted clots of blood and hair. It extended fully six inches down, and when cut the flesh all fell out. The skin was not cut off all around this bruise. At the point where it was cut to the skull, the wound was filled with hair and blood—the fire having left the hair longer at this point than elsewhere on the head. The skin was not burned. At this point the State closed.

Mrs. R. M. Peden, the mother of the defendant's first wife, testified, for the defense, that she had known the defendant since he was four years of age. He lived in her household for three years in Mississippi, and the witness had lived in his in Texas for two years. She had always known him as a peaceable man, and as a quiet, kind and affectionate husband and father. The witness visited the defendant and the deceased in August, 1881, remaining with them three weeks. She saw them daily, and throughout her stay with them the deceased appeared cheerful and content. The witness did not hear during that time a single word of discord between her and defendant. The witness visited them again some time after this, and found them living together pleasantly and agreeably. She had never heard anything of the sickness or bruises of the deceased. The wit-

ness lived within three miles of the defendant during the deceased's lifetime. She visited them no oftener than stated, because she was in bad health and had no means of transportation. She lived with the defendant during the lifetime of his first wife, who was the witness's daughter. She had no hard feelings against the defendant's second or third wives.

Captain F. M. Crane was the next witness for the defense. He testified that, being sent for, he arrived at the defendant's house about nine o'clock and found the body lying on the floor near the fireplace, with the feet extended towards the back of the house. He described the chimney, fireplace, hearth, etc., as they had been described by other witnesses. A slow wood fire was burning when the witness arrived, and the defendant was wringing his hands and crying. Some one, the defendant, perhaps, suggested the propriety of sending for the coroner and two doctors. While this suggestion was being discussed, Buck Richards, who was then talking with the defendant, called the witness, and the defendant complained that two Winnsboro doctors would entail too much expense, and asked why Doctor Pevey would not do. The witness merely replied that if he were defendant he would have the coroner and the two best physicians obtainable. Later, Browning and Robinson started to Winnsboro for the coroner and doctors. The witness followed them to the fence and directed them what to do. The witness. knew nothing about the separation of the deceased and defendant, and knew nothing about how they got along together. He did not know who directed Browning and Robinson to go to· Winnsboro. He did not, in the first instance, but advised with them after they started.

J. A. Lovelady, the defendant's brother, testified that he was told of the death of the defendant's wife about twelve o'clock on the night that it occurred, by Browning and Robinson. He started at once to his brother's house, but changed his mind because of high water in the creek, and then pursued and overtook Browning and Robinson en route to Winnsboro, and traveled with them until their return to defendant's house at daylight, when he found his brother's wife dead. This witness, who had occupied the defendant's house since his arrest, described the· chimney, fireplace and hearth as they were described by other witnesses, except that he stated that some few bricks were loose in the fireplace. The defendant and his wife always got along·

well so far as he could see or knew. He knew nothing of his own knowledge about a separation between them.

Luella Lovelady, the thirteen-year-old daughter of the defendant, testified, for the defense, that on Saturday, the second day before the death of Mrs. Lovelady, the defendant went to Quitman and remained all day. If the deceased abandoned the defendant that day or entertained an idea of doing so, the witness knew nothing about it. She, the deceased, followed the defendant to the gate, and afterwards went to Mrs. Stephens's house and got two smoothing irons, with which on her return she went to ironing. The defendant was told to go by Doctor Pevey's place and send him to see the deceased, who was then and had been for some time quite ill. Doctor Pevey arrived at the house later, and left six doses of powders for the deceased to take. These were placed on the mantel piece, and two of them were taken by the deceased during the next day. On Monday the deceased was worse than usual, and walked about the house only with the assistance of the witness. She had swimming of the head. She lay down shortly before night, and the witness did not see her get up again. The defendant worked about the place all of that day, returning before night and assisting in the preparation of supper. The witness's two little sisters went to bed shortly after supper, occupying places in the witness's bed. The defendant next went to bed with the deceased, occupying the front part of the bed. The witness read her school book awhile, and having latched the front door, retired and went to sleep.

There were two beds in the room on the same side. The one occupied by the witness and her sisters stood in the corner, with the head towards the fireplace and the foot towards the back of the house. The one occupied by the defendant and the deceased stood with the foot towards the foot of the witness's bed, and the head against the side of the house. When the defendant went to bed he asked his wife how she felt, and she replied that she felt worse, and was in great pain. The defendant asked her where the pain was located and she told him. The witness did not hear them speak again.

After a time, she did not know how long, the witness was awakened by a smothering sensation, and found the room full of smoke. She called twice to the defendant before he awakened. He sprang from his bed, ran to the door, opened it, and then exclaimed: "Lord, have mercy! Anna is in the fire!" He

then pulled the deceased from the fire on to the floor, burning his hands severely. The clothing around the deceased's neck was then burning, making a faint light. The defendant then blew a horn from his door to arouse the neighbors. Mr. Browning arrived shortly, and was followed by others after a while. Three doses of the powders were found on the mantel piece.

Cross-examined, the witness stated that the bedsteads were low—not above eighteen inches in height. The foot boards were low. The deceased, as usual, slept behind that night, and the witness could not say how she got out of bed without awakening the defendant. There was an iron wedge in the house, used for propping the door open. There were two borrowed smoothing irons in the house. The defendant owned a hatchet, which was in the yard on that night.

The motion for new trial averred that the proof failed to show the use by the defendant, or other person, of any of the deadly weapons charged in the indictment; a total failure to show express malice; and that the evidence, in its circumstantial or other character, was insufficient to inculpate the defendant beyond a reasonable doubt.

*Herndon & Cain* filed an able and exhaustive brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. It was not error to permit the State's witness, Doctor Skeen, to answer the hypothetical question propounded to him by the district attorney. That question was as follows: "Suppose that a person should strike another on the back of the head at the place described by you, where the skin was off the size of a dollar on the back of the head of deceased, with the large end of an iron wedge, sufficiently hard to tear off the skin and open the wound to the skull, and produce a bruise down the back of the neck several inches long, so that the blood would settle there, would such a blow produce death?" This question was answered by the witness as follows: "Of course such a blow would produce death instantly. At this particular portion of the cranium is the seat of life; a concussion here will injure the spinal column and produce paralysis and death." It was objected to the question that it was hypothetical, and not based upon a state of facts already in evidence; and that it did

not involve a question of science or skill such as would warrant the admission in evidence of the opinion of the witness.

In putting hypothetical questions to an expert witness, counsel may assume the facts in accordance with his theory of them; it is not essential that he state the facts to the witness as they have been proved. (*Guiterman et al.* v. *Liverpool, etc., Steamship Co.*, 83 N. Y., 358; *Cowley* v. *The People*, Id., 464; 1 Greenl. Ev., 440.) Of course, as stated by Mr. Wharton, if the facts on which the hypothesis is based fall, the answer falls also. (Whart. Crim. Ev., 418.) Nor would it be a proper practice to allow hypothetical questions having no foundation whatever in the evidence in the case.

In the case at bar, the witness was shown to be a medical expert, and it was further shown that there was a severe wound upon the back of deceased's head, which could have been inflicted with an iron wedge, and that an iron wedge was found near the body of deceased shortly after her death. We cannot say that the hypothetical question objected to had no foundation in the evidence in the case. It was the theory of the prosecution that deceased was killed by a blow inflicted upon the back of her head, with an iron wedge in the hands of the defendant, and it was proper to permit this theory to be supported by the hypothetical question objected to. As to the other objection to the question, it is also untenable. This precise question is discussed and settled in *Waite* v. *The State*, 13 Texas Court of Appeals, 169, in which case the authorities in support of the admissibility of such evidence are cited.

II. We now approach the principal and most difficult question in this case. It is as to the sufficiency of the evidence to support the conviction. Circumstantial evidence alone is relied upon by the prosecution. Is it of that cogent, satisfactory and convincing character which the law demands to sustain a conviction of crime? It is unnecessary for us to reiterate the rules of the law in regard to the nature, strength, sufficiency, etc., of circumstantial evidence. They have been so often and so fully stated and explained in previous decisions, that we need only refer to the case of *Pogue* v. *The State*, 12 Texas Court of Appeals, 283, where the authorities upon the subject will be found cited.

In prosecutions for murder, the State must establish clearly and satisfactorily the *corpus delicti*. This *corpus delicti* consists of two things; first, a criminal act; and second, the defendant's

agency in the commission of such act. Thus, in the case at bar, the burden of proof was upon the prosecution to establish, first, that Anna Lovelady was dead, that her death was produced by the criminal act of some one other than herself, and was not the result of accident or natural causes; and second, that the defendant committed the act which produced her death. (Whart. Crim. Ev., sec. 325; 1 Bish. Crim. Proc., sec. 1056.) Mr. Wharton says: "It has been already stated that the *corpus delicti* includes two things; first, the objective, and then the subjective elements of criminality; in other words, first, that the overt act took place; secondly, that it took place through criminal agency. Of homicide, therefore, it must be held essential to a conviction, first, that the deceased should be shown to have been killed; and secondly, that this killing should have been proved to have been criminally caused. And on the well known principal that in capital cases this criminal agency of the defendant cannot be proved on his confession alone, without proof of the *corpus delicti*, it must not only be shown, to justify a conviction in such a case, that the deceased was dead, but that his death was criminally produced. Unless the *corpus delicti* in both these respects is proved, a confession is not by itself enough to sustain a conviction." (Whart. on Homicide, sec. 641.) It is perfectly competent to establish the *corpus delicti* by circumstantial evidence (1 Bish. Crim. Proc., 1057), but, as is well said by Mr. Bishop, "special care should be exercised as to the *corpus delicti*, and there should be no conviction except where this part of the case is proved with particular clearness and certainty." (1 Bish. Crim. Proc., sec. 1059.)

What is the evidence relied upon by the prosecution in this case to establish the *corpus delicti?* We will refer to it, and analize it in detail. It establishes beyond any doubt the death of Anna Lovelady. This part of the *corpus delicti* is therefore beyond controversy. What produced the death? This is the first question to be solved, and unless it is clearly and satisfactorily settled by the evidence that the death of Anna Lovelady was produced by the criminal act or agency of some person other than herself, we need proceed no farther with the consideration of the case; for if this important matter be left in doubt, the foundation of the prosecution is fatally insufficient, and the superstructure can not stand. It is shown by the evidence that the deceased was in an advanced state of pregnancy—that she had been in a delicate state of health for some months prior to

J1

her death; that she had been afflicted with excessive hemorrhage from the womb; that she was under the treatment of a physician, and had for several months been threatened with abortion; that she was weak, and unable at times to walk about the house without help; that on the day of her death she had been taking medicine prescribed by her physician; that on the night of her death she complained of being worse, and in much pain; that she had not finished taking all the medicine prescribed by her physician, that he had prepared six powders or doses of medicine for her to take; that she had taken two of the doses, leaving four yet to be taken, and these were upon the mantelpiece over the fireplace. When her dead body was found, it was upon the floor of her house in front of the fireplace and near to it; the clothing had all been burned off the body, and the body itself was terribly burned; the hair was all burned from the head, and the body was in places, both on the back and in front, burned to the hollow, and the breasts were consumed by the fire. Bruises and wounds were discovered upon the body, one of the cheeks was badly bruised; there were two cuts on the top of the head, crossing each other at right angles, which were apparently produced by some sharp instrument. There was a severe bruise or wound on the back of the head and neck, just where the head joins the neck; this wound laid bare the skull, and was as large as a silver dollar, and the blood in the region of it and extending for several inches down the back had coagulated, discoloring the body at that place. None of the wounds upon the head produced a fracture of the skull.

A physician, an expert, testified that the cuts upon the top of the head were not sufficient to produce death, or to stun or fell the deceased, but that the wound upon the back of the head was sufficient to cause death. This physician also stated that he did not know what caused the wound at the back of the head; he had examined the wounds, and he says: "I am now, and have always been, undecided as to how any of the wounds came there. It may have been done by a fall or burn. It is possible it may have been done by the fire. I am unable to decide how, satisfactorily to my own mind."

Again he says: "The settling of the blood down the neck and back of deceased may possibly have been produced by the burn alone. The burn on deceased at the back of the head, also between the shoulders on the back, and that on the breast and

face, would have produced death almost instantly without any other cause."

This constitutes the only expert testimony as to the probable cause of the death of the deceased. What does it establish? Nothing more than that there were wounds upon the body which might have been produced by violence inflicted by another, or by an accidental fall, or by burning. There is no certainty in testimony like this, and it is entitled to but slight consideration. This expert was present soon after the death, and examined the dead body and the surroundings, and he candidly admits and states in his testimony that his mind has never been satisfied as to how the wounds upon the body were produced. We certainly cannot hold that the testimony of this witness establishes the essential fact that the death of deceased was caused by the criminal act of another person.

What other evidence is there in the case tending to establish that fact? It was proved that some months prior to the death of deceased, her husband, the defendant, had ill-treated her; had in fact struck and kicked her; that her death occurred early in the night, between eight and nine o'clock; that the bed upon which the defendant claimed to have been sleeping on the night of her death was found to be smooth and unrumpled when the neighbors reached the scene on that night; that there was an iron wedge found in the house that night, which instrument was capable of inflicting such wounds as were found upon the body of deceased; that the children, who were claimed by defendant to have been asleep in the house at the time of the tragedy, were up and dressed and had on their shoes when the nearest neighbor reached there that night; that the body of deceased was cold and stiff when the neighbors reached it between eight and nine o'clock at night, and that there was no fire in the fireplace except a bed of live coals. We have recited in substance every fact testified to, as presented in the record before us, which in our judgment even remotely tends to prove that the death of deceased was caused by the criminal act of another. Unexplained, this state of facts might be held sufficient proof that the deceased lost her life by the criminal act of another. We are not called upon, however, to determine this question. Much of this evidence, which might otherwise appear inconsistent with the innocence of the defendant, is to our minds explained in a manner which very much weakens its cogency. Thus it is shown that there was a live bed of coals of fire in the fireplace

on that night; that the fireplace was a large one; that the hearth was lower by four or five inches than the floor of the room; that there was a mantel piece above the fireplace on which were the four doses of medicine which the deceased had yet to take; that after her death three only of the four doses of medicine were found upon the mantel; that the back and jambs of the fireplace were brick, and the brick were broken out of the back and had fallen into the fireplace; that there were two broken andirons in the fireplace, and one or two old iron plow-shares.

It is the theory of the defense that the deceased got up from her bed, went to the fireplace to get a dose of the medicine, and swooned and fell into the fire, and that the wounds upon her body were produced by falling upon the broken andirons, plowshares and brick in the fireplace, or by the action of the fire. Is this theory improbable or unreasonable when pro-pounded upon this state of facts? Might not such an accident occur under such circumstances? It was proved that the iron wedge which was found in the house had been kept there to prop open the door, and that it was carefully examined and no blood or other indication of having been used in inflicting wounds was found upon it. It was claimed by defendant that when he awoke the body of deceased was in the fire and burn-ing, and that he pulled it from the fire on to the floor, and in doing so burned his hands severely, and that he also procured water and threw it upon the body to extinguish the fire. In corroboration of this, it was proved that a bucket with some water in it was setting near the dead body, and that the defend-ant's hands were severely burned. It was also proved by the thirteen-year-old daughter of defendant, who was in the house on that night, that when she awoke the house was filled with smoke, and she awoke her father and he sprang out of his bed and pulled the body of deceased out of the fire, etc. In regard to the bed in which the defendant claimed that deceased and himself were sleeping on that night being smooth and un-rumpled, there is no explanation in the evidence    The condition of the bed is testified to by but one witness, and there is opposed to this testimony the positive testimony of defendant's daughter that her father and deceased had gone to bed in that bed, and also by the statements of the defendant which were admitted in evidence as part of the *res gestœ*.

After a very careful consideration of all the evidence, we find

our minds in the same condition as that of the physician, Doctor Skeen. We are unable to determine from the facts before us in what manner or by what means the death of the deceased was produced, whether by natural causes, accident, or the criminal act of another person. There is certainly, in the evidence presented to us, not that moral certainty, that conclusive force, that the death was produced by the criminal act of another, which the law in all such cases imperatively demands in support of a conviction. We must presume the defendant innocent until his guilt is established by competent evidence beyond any reasonable doubt. This presumption of innocence must be met and overthrown by the State, if overthrown at all, not by mere possibilities, probabilities, conjectures, or suspicious circumstances, but by clear, forcible, consistent and satisfactory evidence, which excludes from the mind every reasonable doubt arising from the evidence of the defendant's guilt. In this case we are compelled to say that such is not the character of the evidence relied upon by the State to support this conviction. We always hesitate to disturb the verdict of a jury upon the facts of a case, and we never do so where there is sufficient evidence to sustain the verdict, even where the great preponderance of evidence is against the verdict. But, where, in our judgment, the evidence is wholly insufficient to support a conviction; where it falls short of the positive demands of the law and of reason; where it leaves the issue of guilt in great doubt, and presents a reasonable theory of defendant's innocence, as we think it does in this case, this court, and the Supreme Court of this State, have uniformly considered it not only within their province, but their imperative duty, to interpose between the State and the citizen and guarantee to the latter a fair and impartial trial in accordance with the full measure of the law. By pursuing this course guilty persons may and do sometimes escape the punishment which they deserve, but it is far better that it be thus than that the innocent should be condemned.

Believing that the evidence in this case is insufficient to establish the *corpus delecti*, in that it fails to satisfactorily prove that the death of the deceased was caused by the criminal act of another, it becomes unnecessary for us to consider the case further, and the judgment is reversed and the cause is remanded for another trial

*Reversed and remanded.*

Opinion delivered October 10, 1883.